MINNESOTA METHANE, LLC *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
(SC 17692)

Borden, Norcott, Palmer, Zarella and J. Kaplan, Js.*

---

* The listing of justices reflects their seniority status as of the date of oral argument.

Argued March 12—officially released August 28, 2007

*Michael Kurs*, for the appellant (plaintiff).

*Tatiana D. Eirmann*, assistant attorney general, for the appellee (named defendant).

*Joseph A. Rosenthal*, with whom, on the brief, was *Mary J. Healey*, for the appellee (defendant office of consumer counsel).

*Philip M. Small*, with whom were *Michael E. Kozlik* and, on the brief, *Khristopher M. Gregoire*, for the appellee (defendant Connecticut Light and Power Company).

*Michael J. Donnelly*, with whom, on the brief, were *Peter G. Boucher, Alan P. Curto, Paul R. McCary* and *Richard L. Barger*, for the appellees (defendant Bristol Resources Recovery Facility Operating Committee et al.).

*Opinion*

ZARELLA, J. The plaintiff, Minnesota Methane, LLC, appeals[1] from the judgment of the trial court dismissing its administrative appeal pursuant to General Statutes §§ 4-183[2] and 16-35[3] from the decision of the named

---

[1] The plaintiff appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[3] General Statutes § 16-35 provides in relevant part: "(a) Any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision of the Department of Public Utility Control, except an order, authorization or decision of the department approving the taking of land, in any matter to which such person was or ought to have been made a party or intervenor, may appeal therefrom in accordance with the provisions of section 4-183. . . ."

defendant, the department of public utility control (department), that the defendant Connecticut Light and Power Company (utility) is entitled to renewable energy certificates associated with the plaintiff's electrical output and to proceeds from all prior sales of such certificates by the plaintiff. The plaintiff, joined by the defendants Southeastern Connecticut Regional Resources Recovery Authority, Bristol Resource Recovery Facility Operating Committee and Connecticut Resources Recovery Authority,[4] claims on appeal that the trial court incorrectly concluded that the department had subject matter jurisdiction over this matter. The plaintiff further claims that, if we conclude that the department had jurisdiction, the trial court incorrectly concluded that the department's decision was supported by substantial evidence and did not constitute an unconstitutional taking under article first, § 11, of the Connecticut constitution.[5] The department, the utility and the defendant office of consumer counsel[6] con-

[4] The Southeastern Connecticut Regional Resources Recovery Authority is a regional resources recovery authority for twelve Connecticut municipalities that was created pursuant to statute and assisted in the development of a resources recovery facility in Preston. The Bristol Resource Recovery Facility Operating Committee administers a solid waste disposal program for fourteen Connecticut municipalities, which includes a regional resources recovery facility in Bristol. The Connecticut Resources Recovery Authority was statutorily created to implement solid waste disposal and the development of resource recovery facilities in Connecticut. These entities were designated by the department as intervenors in the proceedings before the department and were defendants in the plaintiff's administrative appeal.

The United Illuminating Company, CHI Energy, Inc., and Wheelabrator Lisbon, Inc., also were intervenors in the proceedings before the department and defendants in the plaintiff's administrative appeal. They are parties to this appeal but have not filed briefs. Wheelabrator Lisbon, Inc., is the plaintiff and appellant in the companion case of *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 931 A.2d 159 (2007).

[5] Article first, § 11, of the Connecticut constitution provides: "The property of no person shall be taken for public use, without just compensation therefor."

[6] General Statutes § 16-2a (a) authorizes the office of consumer counsel "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be

tend to the contrary. We affirm the judgment of the trial court.

As context for our review of the factual and procedural history of this case, we first provide an overview of the relevant regulatory landscape. In 1978, Congress passed the Public Utility Regulatory Policies Act of 1978 (federal act), Pub. L. No. 95-617, 92 Stat. 3117. Section 210 of the federal act, codified as amended at 16 U.S.C. § 824a-3, required the federal Energy Regulatory Commission (federal commission) to prescribe rules requiring electric utilities to purchase electric energy from qualifying small power production facilities. 16 U.S.C. § 824a-3 (a) (2000); see also 18 C.F.R. § 292.303 (a) (2006). "Small power production facility" is defined in relevant part as "a facility which . . . produces electric energy solely by the use . . . of biomass waste [or] renewable resources . . . ." 16 U.S.C. § 796 (17) (A) (i) (2000). The federal act also provides that the rates for the purchase of energy from a small power production facility "shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and . . . shall not discriminate against qualifying cogenerators or small power producers." 16 U.S.C. § 824a-3 (b) (1) and (2) (2000); see also 18 C.F.R. § 292.304 (a) (1) (i) and (ii) (2006). These rates may not exceed "the incremental cost to the electric utility of alternative electric energy"; 16 U.S.C. § 824a-3 (b) (2000); see also 18 C.F.R. § 292.304 (a) (2) (2006); which is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3 (d) (2000). This incremental cost also

involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the Department of Public Utility Control and shall participate in such proceedings to the extent it deems necessary. . . ."

is known as the utility's avoided cost. See 18 C.F.R. § 292.101 (b) (6) (2006).

In adopting the avoided cost regulations, the federal commission assumed that the cost to small power production facilities of generating electricity would be lower than the avoided cost that they would be paid for the energy. See *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, 461 U.S. 402, 406–407, 103 S. Ct. 1921, 76 L. Ed. 2d 22 (1983). The federal commission explained that it had "set the rate [for purchasing electric energy] at full avoided cost rather than at a level that would result in direct rate savings for utility customers" in order "to provide incentives for the development of cogeneration and small power production . . . ." Id., 406. The federal commission also had determined that the rate was "just and reasonable to the electric consumers of the electric utility"; (internal quotation marks omitted) id., 413; even though it was not the "lowest possible reasonable rate consistent with the maintenance of adequate service . . . ." (Internal quotation marks omitted.) Id., 413–14.

The federal act required each state's regulatory authority to implement the rules adopted by the federal commission for each electric utility over which it had ratemaking authority. See 16 U.S.C. § 824a-3 (f) (1) (2000). The Connecticut General Assembly responded by enacting General Statutes § 16-243a et seq., which substantially incorporated the federal definitions and mandates, including the avoided cost pricing provisions. See General Statutes § 16-243a (a) and (c).[7]

---

[7] General Statutes § 16-243a provides in relevant part: "(a) As used in this section, 'avoided costs' means the incremental costs to an electric public service company, municipal electric energy cooperative organized under chapter 101a or municipal electric utility organized under chapter 101, of electric energy or capacity or both which, but for the purchase from a private power producer, as defined in section 16-243b, such company, cooperative or utility would generate itself or purchase from another source. . . .

"(c) The Department of Public Utility Control, with respect to electric public service companies . . . shall establish rates and conditions of service

In response to the enactment of § 16-243a et seq., the department initiated an investigation into cogeneration and small power production. See Decision and Order, Dept. of Public Utility Control, "Investigation into Cogeneration and Small Power Production: 'Going Back to the Future' " (December 11, 1985) (1985 decision and order). In the 1985 decision and order, the department indicated that, in determining pricing methods for such facilities, its goal was "to encourage [small power production facility] development to the maximum feasible extent and to protect utility ratepayers by assuring that over the term of power purchase agreements, there will be net benefits to the state and to ratepayers." Id., p. 30. To meet these objectives, the department indicated that "contracts should achieve payments of 100 [percent] of utility avoided costs over the term of the power purchase agreement" and that "[c]ontracts for [qualified facilities] using renewable fuels should receive more favorable terms than for [qualified facilities] using fossil fuels . . . ." Id. The department also recognized that "proceedings to review cogenerator contracts have often taken longer than the cogenerator, utility or [d]epartment may have wished." Id., p. 47. To address this problem, the department determined that, when "a complete contract is being submitted for review that has the agreement of both [the] utility and [the] cogenerator the [department] will follow expedited procedures . . . ." Id.

Thereafter, the department adopted regulations to implement these policies. The regulations established a competitive bidding process for obtaining a long-term purchase contract that would be triggered only when an electric utility has a demonstrated need for additional

for: (1) The purchase of electrical energy and capacity made available by a private power producer . . . . The rates for electricity purchased from a private power producer shall be based on the full avoided costs of the electric public service company . . . ."

electric generating capacity. See Regs., Conn. State Agencies §§ 16-243a-4 (a) and 16-243a-5. Section 16-243a-7 of the regulations exempts "[p]rojects of five megawatts or less fueled by a renewable resource other than wood" from these standard bidding procedures. Id., § 16-243a-7 (a) (3).

With this regulatory background in mind, we review the facts and procedural history of the present case. The plaintiff owns a landfill gas energy facility in Hartford. In 1996, the plaintiff, pursuant to General Statutes §§ 4-176[8] and 16-243a, submitted to the department a petition for approval of an electricity purchase agreement and for a declaratory ruling that its facility was both a renewable resource project smaller than five megawatts under § 16-243a-7 (a) (3) of the regulations and a "small renewable power project" as defined by General Statutes § 16-243b (a) (6),[9] thereby rendering the plaintiff exempt from the bidding requirements for obtaining a long-term purchase contract with the utility for the sale of electricity. The proposed agreement was the standard form agreement approved by the department and provided that the utility would purchase the entire electrical output of the plaintiff's facility. The plaintiff also requested rulings that the utility's "participation in the transactions specified in the [proposed] [a]greement constitute[s] prudent and efficient management and [is] otherwise consistent with the provisions of [General Statutes] § 16-19e,[10] and that [the utility] be allowed to

---

[8] General Statutes § 4-176 provides in relevant part: "(a) Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency. . . ."

[9] General Statutes § 16-243b (a) (6) provides: " 'Small renewable power project' means any private power production facility which has a capacity of five megawatts or less and is fueled by a renewable resource, as defined in section 16a-2, other than wood."

[10] General Statutes § 16-19e provides: "(a) In the exercise of its powers under the provisions of this title, the Department of Public Utility Control shall examine and regulate the transfer of existing assets and franchises,

recover payments under the [proposed] [a]greement [in a manner] at least as favorable to [the utility] as the manner in which [the utility] recovers fossil fuel expenses."

On October 30, 1996, the department issued a decision in which it found that the plaintiff's facility was a "small renewable power project" under § 16-243b (a) (6) and, therefore, was exempt from the department's standard bidding procedures. This exemption allows small renewable power projects, such as the plaintiff, to obtain long-term purchase power contracts without a determination that the utility has a need for new capacity. The department noted that, without a determination that the plaintiff's facility was a small renewable power project, the plaintiff "would not [have been] eligi-

the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles: (1) That there is a clear public need for the service being proposed or provided; (2) that the public service company shall be fully competent to provide efficient and adequate service to the public in that such company is technically, financially and managerially expert and efficient; (3) that the department and all public service companies shall perform all of their respective public responsibilities with economy, efficiency and care for the public safety, and so as to promote economic development within the state with consideration for energy and water conservation, energy efficiency and the development and utilization of renewable sources of energy and for the prudent management of the natural environment; (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable which shall include, but not be limited to, reasonable costs of security of assets, facilities and equipment that are incurred solely for the purpose of responding to security needs associated with the terrorist attacks of September 11, 2001, and the continuing war on terrorism; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation; and (6) that the rates, charges, conditions of service and categories of service of the companies not discriminate against customers which utilize renewable energy sources or cogeneration technology to meet a portion of their energy requirements. . . ."

ble for a long-term purchase power contract at [that] time." The department further concluded that the plaintiff's production of electricity would further the state's policy of developing diversified energy resources. The department was concerned that the projected avoided costs that provided the basis for the proposed agreement's pricing provision overestimated the actual avoided costs and "could add to . . . high electric rates and future strandable costs." The department concluded, however, that it was constrained by § 16-243a, "which requires that the [d]epartment allow pricing in effect on the date [that] the private power producer submits its proposed contract to the [d]epartment." Accordingly, the department approved the proposed agreement. In 1997, the utility and the plaintiff executed the approved agreement (1997 agreement).

The 1997 agreement contained a dispute resolution clause providing that "[a]ny and all disputes and differences pertaining to or arising out of this [a]greement or the breach thereof, which cannot be settled by mutual consent of both parties and which are not subject to the jurisdiction of the [department], may be submitted to arbitration at the request of either party."

In 2002, the New England Power Pool (NEPOOL)[11] created an accounting device known as generation information system certificates, or renewable energy certificates. NEPOOL created the certificates in part because many states, including Connecticut, had

---

[11] "NEPOOL has been described as a regional power-pooling system with a membership of approximately sixty New England utilities which collectively contain roughly [98] percent of New England's generation capacity. . . . NEPOOL's objectives are to assure the reliability of the region's bulk power supply and to attain maximum practicable economy through, inter alia, joint planning central dispatching . . . and coordinated construction, operation and maintenance of electric generation and transmission facilities owned or controlled by the [p]articipants . . . ." (Citation omitted; internal quotation marks omitted.) *In re Appeal of Conservation Law Foundation of New England, Inc.*, 127 N.H. 606, 632, 507 A.2d 652 (1986).

enacted statutes requiring certain retail sellers of electricity, including the utility, to purchase a specified amount of electricity from renewable energy sources. See, e.g., General Statutes § 16-245a (a).[12] The certificates verify that specified units of electricity have been generated using renewable fuel or have been produced with low emissions and, pursuant to state law, can be purchased to satisfy the state renewable energy requirements. See General Statutes § 16-245a (b).[13] Thus, the certificates effectively "unbundled" the renewable energy attribute of the electric product from the generic energy component for accounting purposes and allowed them to be traded separately. Since 2002, NEPOOL has assigned to the plaintiff, pursuant to NEPOOL's standard rules of operation, the certificates associated with the generation of electricity at the plaintiff's facility, "without prejudice to which person or entity is the owner of such certificates." (Internal quotation marks omitted.)

In 2003, the utility filed a petition with the department (2003 petition) in which it requested that the department reopen the 1996 proceeding and issue a declaratory ruling that the plaintiff was required to transfer the renewable energy certificates to the utility pursuant to the 1997 agreement. The plaintiff opposed the 2003

---

[12] General Statutes § 16-245a (a) requires certain electric suppliers and electric distribution companies to demonstrate that a certain percentage of their energy is generated from "renewable energy sources . . . ." This provision originally was enacted in 1998. See Public Acts 1998, No. 98-28, § 25. Although § 16-245a has been amended since its enactment, those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

In the present case, the parties represented at oral argument to this court that the utility is subject to § 16-245a.

[13] General Statutes § 16-245a (b) provides that certain electric suppliers or electric distribution companies may satisfy the requirements of § 16-245a (a) "by purchasing certificates issued by [NEPOOL] . . . ." This provision originally was codified at § 16-245a (a) (2) and became effective on January 1, 2004. See Public Acts 2003, No. 03-135, § 7.

petition on the ground that the department lacked jurisdiction to hear the matter and that, if the department had jurisdiction, the utility was not entitled to the certificates. The department held a public hearing on the 2003 petition, issued a draft decision and provided all parties to the proceeding an opportunity to file written exceptions and present oral arguments. Thereafter, the department issued its final decision (2004 decision) in which it concluded, first, that it had jurisdiction over the matter under § 4-176 and other state statutes and, second, that the utility was entitled to ownership of the certificates. The department reasoned that the plaintiff's "renewable source of fuel was the necessary condition for [its] approval [of the 1997 agreement]. No other bases existed in [the federal act] or [state] statutes or regulations that [would have allowed the plaintiff] to qualify for the regulatory treatment [that] it [had] received. For [the plaintiff] . . . to claim that the renewable attributes of its fuel are not part of the [d]epartment's approval and therefore not specifically contemplated by the [1997] [a]greement is disingenuous and cannot withstand the clear words of the [1996] [d]ecision or logical scrutiny." The department further stated that, "[w]ere [it] to accept [the plaintiff's] argument that the value of the . . . [c]ertificates remains with them, it would imply that the [d]epartment failed to follow the law and ordered [the utility] to purchase generic electricity."

The plaintiff appealed to the trial court from the 2004 decision pursuant to §§ 4-183 and 16-35.[14] The trial court

---

[14] The plaintiff, along with Wheelabrator Lisbon, Inc., also brought an action in the United States District Court for the District of Connecticut claiming, inter alia, that the ownership of the certificates was controlled by the federal act, and that the department's decision conflicted with that act and violated the contracts and takings clauses of the federal constitution. See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control,* No. 3:04CV1436, 2006 U.S. Dist. LEXIS 45571, *2, *25–*31 (D. Conn. June 23, 2006). The District Court rejected these claims. See id., *28–*31. An appeal before the United States Court of Appeals for the Second Circuit is pending.

concluded that the department had jurisdiction to hear the utility's 2003 petition under § 4-176, among other statutes, that the 2004 decision did not constitute an unconstitutional taking and that there was substantial evidence to support the department's determination that the utility owned the renewable energy certificates. Accordingly, the trial court rendered judgment dismissing the plaintiff's administrative appeal.

This appeal followed. The plaintiff claims on appeal that the trial court incorrectly concluded that (1) the department had subject matter jurisdiction over the contract dispute that formed the basis of the 2003 petition, (2) there was substantial evidence to support the department's 2004 decision, and (3) the 2004 decision did not constitute an unconstitutional taking.[15]

In the companion case of *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 931 A.2d 159 (2007), we addressed substantially identical claims and concluded that the department had jurisdiction over the dispute, that there was substantial evidence to support the department's 2004 decision and that the 2004 decision did not constitute an unconstitutional taking. We adopt the reasoning and conclusions of that decision in the present case and, accordingly, reject the plaintiff's claims on appeal.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[15] The plaintiff also claims that the department violated the constitutional separation of powers doctrine when it ordered the plaintiff to transfer the renewable energy certificates to the utility. That claim was not raised in the trial court, however, and, therefore, was not preserved for review. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004).