WHEELABRATOR LISBON, INC. *v.* DEPARTMENT OF
PUBLIC UTILITY CONTROL ET AL.
(SC 17691)

Borden, Norcott, Palmer, Zarella and J. Kaplan, Js.*

* The listing of justices reflects their seniority status as of the date of oral argument.

674

Argued March 12—officially released August 28, 2007

*Michael Kurs*, for the appellant (plaintiff).

*Tatiana Eirmann*, assistant attorney general, for the appellee (named defendant).

*Joseph A. Rosenthal*, with whom, on the brief, was *Mary J. Healey*, for the appellee (defendant office of consumer counsel).

*Philip M. Small*, with whom were *Michael E. Kozlik* and, on the brief, *Khristopher M. Gregoire*, for the appellee (defendant Connecticut Light and Power Company).

ZARELLA, J. The plaintiff, Wheelabrator Lisbon, Inc.,[1] appeals[2] from the judgment of the trial court dismissing its administrative appeal pursuant to General Statutes §§ 4-183[3] and 16-35[4] from the decision of the named defendant, the department of public utility control (department), that the defendant Connecticut Light and Power Company (utility) is entitled to renewable energy certificates associated with the plaintiff's electrical output and to proceeds from all prior sales of such certificates by the plaintiff. The plaintiff claims on appeal that the trial court incorrectly concluded that the department had subject matter jurisdiction over this matter. The plaintiff further claims that, if we conclude that the department had jurisdiction, the trial court incorrectly concluded that the department's decision was supported by substantial evidence and did not constitute an unconstitutional taking under article first, § 11, of the Connecticut constitution.[5] The department, the util-

---

[1] The plaintiff was formerly known as Riley Energy Systems of Lisbon Corporation.

[2] The plaintiff appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[4] General Statutes § 16-35 provides in relevant part: "(a) Any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision of the Department of Public Utility Control, except an order, authorization or decision of the department approving the taking of land, in any matter to which such person was or ought to have been made a party or intervenor, may appeal therefrom in accordance with the provisions of section 4-183. . . ."

[5] Article first, § 11, of the Connecticut constitution provides: "The property of no person shall be taken for public use, without just compensation therefor."

ity and the defendant office of consumer counsel[6] contend to the contrary.[7] We affirm the judgment of the trial court.

As context for our review of the factual and procedural history of this case, we first provide an overview of the relevant regulatory landscape. In 1978, Congress passed the Public Utility Regulatory Policies Act of 1978 (federal act), Pub. L. No. 95-617, 92 Stat. 3117. Section 210 of the federal act, codified as amended at 16 U.S.C. § 824a-3, required the federal Energy Regulatory Commission (federal commission) to prescribe rules requiring electric utilities to purchase electric energy from qualifying small power production facilities. 16 U.S.C. § 824a-3 (a) (2000); see also 18 C.F.R. § 292.303 (a) (2006). "Small power production facility" is defined in relevant part as "a facility which . . . produces electric energy solely by the use . . . of biomass waste [or] renewable resources . . . ." 16 U.S.C. § 796 (17) (A) (i) (2000). The federal act also provides that the rates for the purchase of energy from a small power production facility "shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and . . . shall not discriminate against qualifying cogenerators or small power producers." 16 U.S.C. § 824a-3 (b) (1) and (2) (2000); see also 18 C.F.R. § 292.304 (a) (1) (i) and (ii) (2006). These rates may

---

[6] General Statutes § 16-2a (a) authorizes the office of consumer counsel "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the Department of Public Utility Control and shall participate in such proceedings to the extent it deems necessary. . . ."

We refer to the department, the utility and the defendant office of consumer counsel collectively as the defendants.

[7] The United Illuminating Company also intervened as a defendant in the proceedings before the department and was a defendant in the administrative appeal before the trial court. It is a party to this appeal but has not filed a brief.

not exceed "the incremental cost to the electric utility of alternative electric energy"; 16 U.S.C. § 824a-3 (b) (2000); see also 18 C.F.R. § 292.304 (a) (2) (2006); which is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3 (d) (2000). This incremental cost also is known as the utility's avoided cost. See 18 C.F.R. § 292.101 (b) (6) (2006).

In adopting the avoided cost regulations, the federal commission assumed that the cost to small power production facilities of generating electricity would be lower than the avoided cost that they would be paid for the energy. See *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, 461 U.S. 402, 406–407, 103 S. Ct. 1921, 76 L. Ed. 2d 22 (1983). The federal commission explained that it had "set the rate [for purchasing electric energy] at full avoided cost rather than at a level that would result in direct rate savings for utility customers" in order "to provide incentives for the development of cogeneration and small power production . . . ." Id., 406. The federal commission also had determined that the rate was "just and reasonable to the electric consumers of the electric utility"; (internal quotation marks omitted) id., 413; even though it was not the "lowest possible reasonable rate consistent with the maintenance of adequate service . . . ." (Internal quotation marks omitted.) Id., 413–14.

The federal act required each state's regulatory authority to implement the rules adopted by the federal commission for each electric utility over which it had ratemaking authority. See 16 U.S.C. § 824a-3 (f) (1) (2000). The Connecticut General Assembly responded by enacting General Statutes § 16-243a et seq., which substantially incorporated the federal definitions and

mandates, including the avoided cost pricing provisions. See General Statutes § 16-243a (a) and (c).[8]

In response to the enactment of § 16-243a et seq., the department initiated an investigation into cogeneration and small power production. See Decision and Order, Dept. of Public Utility Control, "Investigation into Cogeneration and Small Power Production: 'Going Back to the Future'" (December 11, 1985) (1985 decision and order). In the 1985 decision and order, the department indicated that, in determining pricing methods for such facilities, its goal was "to encourage [small power production facility] development to the maximum feasible extent and to protect utility ratepayers by assuring that over the term of power purchase agreements, there will be net benefits to the state and to ratepayers." Id., p. 30. To meet these objectives, the department indicated that "contracts should achieve payments of 100 [percent] of utility avoided costs over the term of the power purchase agreement" and that "[c]ontracts for [qualified facilities] using renewable fuels should receive more favorable terms than for [qualified facilities] using fossil fuels . . . ." Id. The department also recognized that "proceedings to review cogenerator contracts have often taken longer than the cogenerator, utility or [d]epartment may have wished." Id., p. 47. To address this problem, the department determined that, when "a

---

[8] General Statutes § 16-243a provides in relevant part: "(a) As used in this section, 'avoided costs' means the incremental costs to an electric public service company, municipal electric energy cooperative organized under chapter 101a or municipal electric utility organized under chapter 101, of electric energy or capacity or both which, but for the purchase from a private power producer, as defined in section 16-243b, such company, cooperative or utility would generate itself or purchase from another source. . . .

"(c) The Department of Public Utility Control, with respect to electric public service companies . . . shall establish rates and conditions of service for: (1) The purchase of electrical energy and capacity made available by a private power producer . . . . The rates for electricity purchased from a private power producer shall be based on the full avoided costs of the electric public service company . . . ."

complete contract is being submitted for review that has the agreement of both [the] utility and [the] cogenerator the [department] will follow expedited procedures . . . ." Id.

Thereafter, the department adopted regulations to implement these policies. The regulations established a competitive bidding process for obtaining a long-term purchase contract that would be triggered only when an electric utility has a demonstrated need for additional electric generating capacity. See Regs., Conn. State Agencies §§ 16-243a-4 (a) and 16-243a-5. Section 16-243a-7 of the regulations exempts "[r]esource recovery projects[9] which seek pricing under the provisions of [General Statutes §] 16-243a" from these standard bidding procedures. Id., § 16-243a-7 (a) (4).

With this regulatory background in mind, we review the facts and procedural history of the present case. The plaintiff operates a municipal solid waste burning electric generating facility in Lisbon. In 1991, the plaintiff, pursuant to General Statutes §§ 4-176[10] and 16-243a, submitted to the department a petition for a declaratory ruling that its facility was a resource recovery project and was therefore exempt under § 16-243a-7 (a) (4) of the regulations from the bidding requirements for obtaining a long-term purchase contract with the utility. In the petition, the plaintiff also sought a ruling that the utility was required by the 1985 decision and order and "by [§] 16-243a . . . and . . . [the department's] [r]egulations to enter into an [e]lectricity [p]urchase

---

[9] General Statutes § 22a-207 (9) defines "resources recovery facility" as "a facility utilizing processes to reclaim energy from municipal solid waste . . . ."

[10] General Statutes § 4-176 provides in relevant part: "(a) Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency. . . ."

[a]greement [1991 agreement] . . . to purchase electricity generated by the [the plaintiff's] [f]acility at the rates set forth in that [a]greement." In support of this request, the plaintiff represented that the utility's "participation in the transactions specified in the [1991] [a]greement constitutes prudent and efficient management and is otherwise consistent with the provisions of [General Statutes] § 16-19e[11] . . . . [Thus, for the term of the 1991 agreement, the utility] will be allowed to recover payments under the [1991] [a]greement in a manner at least as favorable to [the utility] as the manner in which [the utility] recovers fossil fuel expenses." The 1991 agreement provided that the utility "will pur-

---

[11] General Statutes § 16-19e provides in relevant part: "(a) In the exercise of its powers under the provisions of this title, the Department of Public Utility Control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles: (1) That there is a clear public need for the service being proposed or provided; (2) that the public service company shall be fully competent to provide efficient and adequate service to the public in that such company is technically, financially and managerially expert and efficient; (3) that the department and all public service companies shall perform all of their respective public responsibilities with economy, efficiency and care for the public safety, and so as to promote economic development within the state with consideration for energy and water conservation, energy efficiency and the development and utilization of renewable sources of energy and for the prudent management of the natural environment; (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable which shall include, but not be limited to, reasonable costs of security of assets, facilities and equipment that are incurred solely for the purpose of responding to security needs associated with the terrorist attacks of September 11, 2001, and the continuing war on terrorism; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation; and (6) that the rates, charges, conditions of service and categories of service of the companies not discriminate against customers which utilize renewable energy sources or cogeneration technology to meet a portion of their energy requirements. . . ."

chase and [the plaintiff] will sell the entire [n]et [e]lectric [o]utput of the [f]acility . . . ."

On March 13, 1991, the department issued a decision in which it found that the plaintiff's facility was a resource recovery project within the meaning of § 16-243a-7 (a) (4) of the regulations, that the plaintiff's production of electricity would further the state's policy of developing diversified energy resources, that its status entitled it under § 16-243a-7 (a) (4) to contract to sell electricity to the utility even though the utility did not have a need for additional capacity, and that the plaintiff was exempt from the department's standard bidding procedures. The department also found that "payments over the twenty-five year life of the [p]roject [were] expected to be [99 percent] of the most recently approved avoided costs" for the utility. The department concluded that the 1991 agreement between the plaintiff and the utility met all applicable regulatory criteria and approved it.

The 1991 agreement contained a dispute resolution clause providing that "[a]ny dispute regarding payments from the [utility] to [the plaintiff] or interpretation of [the] [a]greement not covered by subsection (b) [of paragraph twenty-three][12] shall be presented to the [department] for resolution. Any decision of the [department] as to the matter submitted to it shall be subject to appeal in the normal manner for appeals from decisions of the [department]. If the [department] fails or refuses to resolve any such disputes, or fails to act on such disputes within a reasonable period of time not to exceed ninety . . . days, such dispute shall be subject to resolution by any court of competent jurisdiction within the [s]tate of Connecticut."

---

[12] Subsection (b) of paragraph twenty-three of the agreement pertained to disputes over engineering and technical issues relating to construction, operation and maintenance of the plaintiff's facility.

In 2002, the New England Power Pool (NEPOOL)[13] created an accounting device known as generation information system certificates, or renewable energy certificates. NEPOOL created the certificates in part because many states, including Connecticut, had enacted statutes requiring certain retail sellers of electricity, including the utility, to purchase a specified amount of electricity from renewable energy sources. See, e.g., General Statutes § 16-245a (a).[14] The certificates verify that specified units of electricity have been generated using renewable fuel or have been produced with low emissions and, pursuant to state law, can be purchased to satisfy the state renewable energy requirements. See General Statutes § 16-245a (b).[15] Thus, the

---

[13] "NEPOOL has been described as a regional power-pooling system with a membership of approximately sixty New England utilities which collectively contain roughly [98] percent of New England's generation capacity. . . . NEPOOL's objectives are to assure the reliability of the region's bulk power supply and to attain maximum practicable economy through, inter alia, joint planning, central dispatching . . . and coordinated construction, operation and maintenance of electric generation and transmission facilities owned or controlled by the [p]articipants . . . ." (Citation omitted; internal quotation marks omitted.) In re Appeal of Conservation Law Foundation of New England, Inc., 127 N.H. 606, 632, 507 A.2d 652 (1986).

[14] General Statutes § 16-245a (a) requires certain electric suppliers and electric distribution companies to demonstrate that a certain percentage of their energy is generated from "renewable energy sources . . . ." This provision originally was enacted in 1998. See Public Acts 1998, No. 98-28, § 25. Although § 16-245a has been amended since its enactment, those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

In the present case, none of the parties claimed that the utility was subject to the requirements of § 16-245a, and nothing in the record supports such a conclusion. In the companion case of Minnesota Methane, LLC v. Dept. of Public Utility Control, 283 Conn. 700, 710 n.12, 931 A.2d 177 (2007), however, which involves the same issues as this case and many of the same parties, the parties represented at oral argument to this court that the utility was subject to § 16-245a.

[15] General Statutes § 16-245a (b) provides that certain electric suppliers or electric distribution companies may satisfy the requirements of § 16-245a (a) "by purchasing certificates issued by [NEPOOL] . . . ." This provision originally was codified at § 16-245a (a) (2) and became effective on January 1, 2004. See Public Acts 2003, No. 03-135, § 7.

certificates effectively "unbundled" the renewable energy attribute of the electric product from the generic energy component for accounting purposes and allowed them to be traded separately. Since 2002, NEPOOL has assigned to the plaintiff, pursuant to NEPOOL's standard rules of operation, the certificates associated with the generation of electricity at the plaintiff's facility, "without prejudice to which person or entity is the owner of such certificates."

In 2004, the utility filed a petition with the department (2004 petition) in which it requested that the department reopen the 1991 proceeding and issue a declaratory ruling that the plaintiff was required to transfer the renewable energy certificates to the utility pursuant to the 1991 agreement. The plaintiff opposed the 2004 petition on the ground that the department lacked jurisdiction to hear the matter and that, if the department had jurisdiction, the utility was not entitled to the certificates. The department held a public hearing on the 2004 petition, issued a draft decision and received comments. Thereafter, the department issued its final decision (2004 decision) in which it concluded, first, that it had jurisdiction over the matter under § 4-176 and other state statutes and, second, that the 1991 agreement required the plaintiff to transfer the certificates to the utility. The department reasoned that "the 'electricity' that [the plaintiff] offered to sell and that the [d]epartment ordered [the utility] to purchase necessarily meant electricity generated by renewable fuel. No other electricity generated by [the plaintiff] would have qualified [the plaintiff] for the . . . statutory and regulatory treatment [that] it [had] received."

The plaintiff appealed to the trial court from the 2004 decision pursuant to §§ 4-183 and 16-35.[16] The trial court

[16] The plaintiff, along with Minnesota Methane, LLC, also brought an action in the United States District Court for the District of Connecticut claiming, inter alia, that the ownership of the renewable energy certificates was controlled by the federal act, and that the department's decision conflicted

concluded that the department had jurisdiction to hear the utility's 2004 petition under § 4-176, among other statutes, that the 2004 decision did not constitute an unconstitutional taking and that there was substantial evidence to support the department's determination that the 1991 agreement required the plaintiff to transfer the renewable energy certificates to the utility. Accordingly, the trial court rendered judgment dismissing the plaintiff's administrative appeal.

This appeal followed. The plaintiff claims on appeal that the trial court incorrectly concluded that (1) the department had subject matter jurisdiction over the contract dispute that formed the basis of the 2004 petition, (2) there was substantial evidence to support the department's 2004 decision, and (3) the 2004 decision did not constitute an unconstitutional taking. We reject each claim and, therefore, affirm the trial court's judgment.

I

We first address the plaintiff's claim that the trial court incorrectly determined that the department had subject matter jurisdiction over the utility's 2004 petition to reopen the 1991 proceeding for the purpose of determining the ownership of the renewable energy certificates. The plaintiff argues that the department lacked jurisdiction because the issue of whether the utility or the plaintiff owned the certificates under the 1991 agreement is a question of the intent of the parties under a privately negotiated agreement, and no state statute confers jurisdiction on the department to decide such an issue. The defendants counter that the depart-

with that act and violated the contracts and takings clauses of the federal constitution. See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, No. 3:04CV1436, 2006 U.S. Dist. LEXIS 45571, *2, *25–*31 (D. Conn. June 23, 2006). The District Court rejected these claims. See id., *28–*31. An appeal before the United States Court of Appeals for the Second Circuit is pending.

ment was authorized by statute to set the parameters for contracts between small power production facilities and utilities, and to review and approve such contracts, and that this statutory authority necessarily encompassed the resolution of pricing disputes. Accordingly, the defendants argue, the department had jurisdiction over the 2004 petition under § 4-176 and General Statutes § 16-9.[17] We agree with the defendants that the department had jurisdiction over the 2004 petition.

At the outset, we set forth our standard of review. "Administrative agencies are tribunals of limited jurisdiction and their jurisdiction is dependent entirely [on] the validity of the statutes vesting them with power and they cannot confer jurisdiction [on] themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions, under which it acquires authority unless the statutes expressly grant it that power." (Citations omitted; internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 428, 541 A.2d 1216 (1988). "[A] subject matter jurisdictional defect may not be waived . . . [or jurisdiction] conferred by the parties, explicitly or implicitly. . . . [T]he question of subject matter jurisdiction is a question of law . . . and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case. . . . We have long held that because [a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 283, 914 A.2d 996 (2007).

---

[17] General Statutes § 16-9 provides in relevant part that the "department may, at any time, for cause shown, upon hearing had after notice to all parties of interest, rescind, reverse or alter any decision, order or authorization by it made. . . ."

Administrative agencies have jurisdiction not only to determine the applicability of statutes to particular facts but "[to] issue declaratory rulings based on their interpretations of statutes." *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson*, 173 Conn. 352, 356, 377 A.2d 1099 (1977). "It is inherent in our judicial system of dispute resolution that the interpretation of statutes, like the development of the common law, grows out of the filtering of a set of facts through the law as seen by the [agency] . . . ." Id., 356–57.

In the present case, the plaintiff does not dispute that the department had jurisdiction under § 4-176 to determine whether the plaintiff's facility was a resource recovery project within the meaning of § 16-243a-7 (a) (4) of the regulations, whether the plaintiff's production of electricity would further the state's policy of developing diversified energy resources, whether its status entitled it to contract to sell electricity even though the utility did not have a need for additional capacity and whether the plaintiff was exempt from the department's standard bidding procedures. Nor does the plaintiff dispute that the department had jurisdiction to determine whether the pricing structure of the 1991 agreement complied with the requirement of § 16-243a that the rates paid by the utility be based on avoided costs. The plaintiff does claim, however, that the department, having made these determinations, lacked jurisdiction to reopen the 1991 proceeding to determine whether the parties intended that the rates set forth in the 1991 agreement would include the renewable energy attribute of the plaintiff's electrical production, now represented by the certificates. We disagree.

First, we are unable to accept the plaintiff's characterization of the issue before us as one of pure contractual intent. See *Indeck-Yerkes Energy Services, Inc.* v. *Public Service Commission*, 164 App. Div. 2d 618, 621, 564 N.Y.S.2d 841 (1991) (meaning of contract between

cogeneration facility and utility "is not [issue] of pure interpretation of the language of the agreement"). As we have indicated, the department's approval of the 1991 agreement was premised on the department's determination that the plaintiff was a resource recovery facility, as defined by General Statutes § 22a-207 (9),[18] that sought pricing under the avoided cost rate provisions of § 16-243a. Accordingly, as with other terms of the 1991 agreement, the meaning of the agreement's pricing provisions, including whether they were intended to transfer ownership of the renewable energy component of the electricity to the utility, is more a question of legislative intent and public policy than a question of the intent of the parties.[19] See *Connecticut Resources Recovery Authority* v. *Connecticut Light & Power Co.*, 34 Conn. App. 246, 249, 641 A.2d 398 (1994) (construing contractual dispute resolution provision

---

[18] See footnote 9 of this opinion for the text of § 22a-207 (9).

[19] The defendants cite *Panda-Kathleen, L.P.* v. *Clark*, 701 So. 2d 322 (Fla. 1997), cert. denied sub nom. *Panda-Kathleen, L.P.* v. *Florida Power Corp.*, 523 U.S. 1073, 118 S. Ct. 1514, 140 L. Ed. 2d 668 (1998), and *In re Covanta Energy Group*, 105 F.E.R.C. 61,004 (2003), rehearing denied sub nom. *In re American Ref-Fuel Co.*, 107 F.E.R.C. 61,016 (2004), for the proposition that states have jurisdiction over disputes arising from agreements between utilities and small power production facilities that fall within the scope of the federal act, and that such disputes are not governed solely by federal law. These cases are not squarely on point because the plaintiff in the present case is not raising a federal preemption claim but is claiming that nothing in this state's laws confers jurisdiction on the department to determine the private intent of the parties under the 1991 agreement. Nevertheless, we agree with the defendants that these cases provide support for the proposition that, when a state has enacted statutes implementing the public policy underlying the federal act and a state agency is charged with administering those statutes and that policy, the agency has jurisdiction "to review [such agreements] to ensure that they are fair to the parties to the contract and that they further the energy policies of the [s]tate as defined by the [l]egislature." (Internal quotation marks omitted.) *Panda-Kathleen, L.P.* v. *Clark*, supra, 326; see also *In re Covanta Energy Group*, supra, 61,007 ("[w]hile a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created [certificates], that requirement must find its authority in state law, not [the federal act]").

similar to provision in present case and concluding that "the parties' intent as evidenced by their agreement aligns with the intent of the state legislature that the department regulate and supervise public utilities and establish reasonable rates"). Indeed, although the department concluded in the 2004 decision that "the parties intended that renewable energy attributes generated by [the plaintiff] . . . [would] be included in the 'entire net electric output of the facility,' " it also concluded that the renewable energy certificates "are and *were intended by the [d]epartment* to be sold by [the plaintiff] and purchased by [the utility]. The [d]epartment's reliance on Connecticut's unique body of law is the necessary and material condition for [the] . . . approval" of the 1991 agreement.[20] (Emphasis added.)

It is apparent that, if the certificates had been in existence when the 1991 agreement was under review by the department, and the intent of the parties with respect to the ownership of the certificates had been clear, the department would have had jurisdiction to determine whether the legislature intended that the avoided costs would include the renewable energy attribute of the energy sold by resource recovery projects for purposes of §§ 16-243a and 16-245a and whether the parties' intent was consistent with those statutes and the public policies that they embody. Cf. *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* supra, 173 Conn. 356. Specifically, the department would have had jurisdiction to interpret the governing statutes to determine (1) whether the legislature intended that the word "electricity" in the phrase "rates for electricity purchased from a private power producer . . . based on the full avoided costs" in General Statutes § 16-243a

---

[20] See *Indeck-Yerkes Energy Services, Inc.* v. *Public Service Commission,* supra, 164 App. Div. 2d 622–23 (regulatory considerations underlying utility commission's initial approval of contract between cogeneration facility and utility guide resolution of dispute arising from contract).

(c)—which provided the basis for the 1991 agreement—include the renewable energy component represented by the certificates or, instead, meant generic electricity without the renewable energy component, and (2) whether the electricity that the utility purchased at the avoided cost rate should be applied to its renewable energy portfolio requirement under § 16-245a (a), or, instead, the utility should be required to purchase *both* the electricity *and* the certificates to meet the requirement. In enacting the avoided cost price provision, the state legislature adopted a federal policy that was intended to balance Congress' desire to encourage the use of renewable energy sources with its desire to ensure that the rate paid by consumers was just and reasonable, legislative desires that the department is charged with implementing. We see no reason to conclude that the department lacked jurisdiction to make these determinations under §§ 4-176 and 16-9 merely because the certificates were created and § 16-245a, which recognized and gave value to the certificates, was enacted after the execution of the 1991 agreement.

The fact that the terms of the 1991 agreement were negotiated by the parties and not dictated by the department does not affect this conclusion. The pricing and payment structure of the 1991 agreement was subject to review and approval by the department to ensure that it complied with the applicable statutes and regulations and that it was consistent with public policy regardless of whether the parties voluntarily had agreed to its terms.[21] Accordingly, we conclude that the department

---

[21] The plaintiff also claims that the department lacked jurisdiction over this matter because it has not adopted regulations governing the ownership of renewable energy certificates. If the department lacked jurisdiction over the claim in the absence of such regulations, however, then the adoption of regulations could not change that fact. An agency cannot vest itself with subject matter jurisdiction. To the extent that the plaintiff claims that, even if the department had jurisdiction over the utility's 2004 petition, its decision constituted improper rulemaking; see, e.g., *Persico* v. *Maher*, 191 Conn. 384, 400–405, 465 A.2d 308 (1983); that claim was not raised in the trial court

had jurisdiction over the issues raised in the 2004 proceeding.

## II

We next address the plaintiff's claim that the department's determination that the utility was entitled to the renewable energy certificates and to the proceeds from all prior sales of the certificates was not supported by substantial evidence.[22] The gist of the plaintiff's argument is that it was entitled to special regulatory treatment because of its *status* as a resource recovery facility, i.e., a producer of renewable energy, and not because the electricity that it actually sold to the utility included any renewable energy attribute. We disagree.

"[J]udicial review of the [department's] action is governed by the Uniform Administrative Procedure Act [(UAPA), General Statutes §§ 4-166 through 4-189], and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administra-

and, therefore, was not preserved for review. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission,* 269 Conn. 57, 82, 848 A.2d 395 (2004).

[22] We note that the plaintiff devoted only approximately one-half of one page of its appellate brief to this issue and argued only that *one* of the arguments relied on by the department and the trial court in support of their conclusions that the utility was entitled to the certificates was not supported by substantial evidence. Ordinarily, this court will not address claims that have been inadequately briefed. See, e.g., *State* v. *Clark,* 255 Conn. 268, 281 n.30, 764 A.2d 1251 (2001) ("[c]laims on appeal that are inadequately briefed are deemed abandoned" [internal quotation marks omitted]). We do so in the present case, however, because the defendants adequately briefed this issue and because the issue is a matter of some public importance.

tive agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Citation omitted; internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000).

"Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . We also have held that an exception is made when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . [in which case] the agency is not entitled to special deference." (Internal quotation marks omitted.) *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 771–72, 817 A.2d 644 (2003); see *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 109, 653 A.2d 782 (1995) ("the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . [but] it is for the courts, and not for administrative agencies, to expound and apply governing principles of law" [citations omitted; internal quotation marks omitted]).

As we have indicated, the present case required the department to determine whether the word "electricity" as used in § 16-243a (c), which provided the basis for the 1991 agreement, included the renewable energy component of the electricity and whether the purchase of such electricity at the avoided cost rate entitled the utility to credit for the purchase of renewable energy

for purposes of § 16-245a. Because this is a question of statutory interpretation that previously has not been subject to judicial scrutiny, our review ordinarily would be plenary. Nevertheless, in light of the extremely complex and technical regulatory and policy considerations implicated by this issue, we are not persuaded that we may substitute our judgment for that of the department. Rather, this "is precisely the type of situation that calls for agency expertise." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 139, 778 A.2d 7 (2001); see also *Christopher R.* v. *Commissioner of Mental Retardation*, 277 Conn. 594, 611, 893 A.2d 431 (2006) ("we generally defer to an agency with expertise in matters requiring such a technical . . . determination"); cf. *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 279 Conn. 584, 593, 905 A.2d 1 (2006) ("In the specialized context of a rate case, the court may not substitute its own balance of the regulatory considerations for that of the agency, and must assure itself that the [department] has given reasoned consideration to the factors expressed in § 16-19e [a]. . . . This broad grant of regulatory authority carries with it the necessarily equally broad discretion, to be exercised within legal limits . . . ." [Citations omitted; internal quotation marks omitted.]). Deference is particularly appropriate because the department's interpretation of § 16-243a was informed by its interpretation of its own regulations. See *MacDermid, Inc.* v. *Dept. of Environmental Protection*, supra, 138–39 (principle that courts defer to agency's interpretation of statutes "applies with even greater force to an agency's interpretation of its own duly adopted regulations" [internal quotation marks omitted]). Accordingly, we limit our review to a determination of whether the department gave reasoned consideration to all of the relevant factors or whether it abused its discretion.

We turn next to the substantive principles that guide and limit the department's exercise of discretion. The federal commission has concluded that the ownership of renewable energy certificates is an issue to be decided on the basis of state law and policy, and is not controlled by federal law. In *In re Covanta Energy Group*, 105 F.E.R.C. 61,004, 61,005 (2003), rehearing denied sub nom. *In re American Ref-Fuel Co.*, 107 F.E.R.C. 61,016 (2004), several renewable energy facilities filed a petition with the federal commission seeking a declaratory order that avoided cost contracts entered into pursuant to the federal act do not automatically convey ownership of certificates to the purchasing utility in the absence of an express contractual provision to the contrary. The federal commission noted that the factors to be considered in determining avoided costs under the federal act did not include the renewable attribute of the energy generated by the renewable energy facility. See id., 61,007. "This is because avoided costs were intended to put the utility [in] the same position when purchasing [qualified facility] capacity and energy as if the utility generated the energy itself or purchased the energy from another source. In this regard, the avoided cost that a utility pays a [qualified facility] does not depend on the type of [qualified facility], i.e., whether it is a fossil-fuel-cogeneration facility or a renewable-energy small power production facility. The avoided cost rates, in short, are not intended to compensate the [qualified facility] for more than capacity and energy." Id. Accordingly, the federal commission concluded that, under federal law, "contracts for the sale of [qualified facility] capacity and energy entered into pursuant to [the federal act] do not convey [renewable energy certificates] to the purchasing utility (absent an express provision in a contract to the contrary)." Id.

The federal commission also noted, however, that renewable energy certificates "are created by the

[s]tates. They exist outside the confines of the [federal act]," and the issues of who owns them and to whom they may be sold or traded are not controlled by the federal act. Id. Accordingly, the federal commission also concluded that, although "a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created [renewable energy certificates], that requirement must find its authority in state law, not [the federal act]." Id. Commissioner Nora Mead Brownell dissented from the federal commission's decision, stating that she agreed that the ownership of the certificates was not controlled by the federal act but that the majority's conclusion that avoided cost contracts do not automatically convey the certificates to the purchasing utility under the federal act was inconsistent with that conclusion. Id., 61,008; see also E. Holt, R. Wiser & M. Bolinger, "Who Owns Renewable Energy Certificates? An Exploration of Policy Options and Practice" (Ernest Orlando Lawrence Berkeley National Laboratory Report No. LBNL-59965, April, 2006) p. 51 (commission's conclusion that "avoided cost payments mandated by [the federal act] pay only for energy and capacity and do not convey the renewable attributes" appears to contradict conclusion that states must decide ownership), available at http://eetd.lbl.gov/ea/emp/reports/59965.pdf.

In *In re Ownership of Renewable Energy Certificates*, 389 N.J. Super. 481, 913 A.2d 825 (App. Div. 2007), the Appellate Division of the New Jersey Superior Court concluded that, although the federal commission's analysis of the issue of certificate ownership under federal law in *In re Covanta Energy Group* could be interpreted as supporting the argument that the certificates are not conveyed from the renewable energy source to the utility in the absence of an explicit contractual term to the contrary, the decision is more properly read as standing for the proposition that the issue is one of

state law. Id., 490–91; see also E. Holt, R. Wiser & M. Bolinger, supra, p. x.

"The issue of initial ownership of [r]enewable [e]nergy [c]ertificates for existing contracts that did not anticipate their creation has arisen in at least nine other states. Each state has ruled . . . that as applied to existing contracts for the sale of power to utilities by renewable energy producers, the certificates are the property of the purchasing utility rather than the producer." *In re Ownership of Renewable Energy Certificates*, supra, 389 N.J. Super. 485, citing E. Holt, R. Wiser & M. Bolinger, supra, p. xiv.[23] State regulatory agencies have considered the following factors in reaching this conclusion: (1) the fact that utilities would not be obligated to purchase electricity from renewable energy sources if not for their regulatory status and, therefore, that the renewable attributes are inextricably tied to the electricity; (2) requiring utilities to pay extra for the certificates would be a windfall to the renewable energy sources who contracted to receive the avoided cost without any expectation of additional remuneration; and (3) in states that require utilities to purchase a certain percentage of their energy from renewable energy sources, awarding the certificates to the renewable energy facility would mean that the utilities that are subject to the requirement would have to pay the facility twice, once based on avoided cost and a second

---

[23] Utility regulatory agencies in Colorado, Maine, Minnesota, North Dakota, New Jersey, New Mexico, Nevada, Texas and Wisconsin have concluded that the purchasing utility owns the renewable energy certificates when the purchase contract predates the creation of the certificates and the statutory requirement that a certain percentage of the energy purchased by certain retail sellers of electricity be from renewable energy sources. See E. Holt, R. Wiser & M. Bolinger, supra, p. xiv. Regulatory agencies in Colorado, Nevada, Oregon, Rhode Island, Texas and Utah have concluded that the certificates associated with purchase contracts executed after the creation of the statutory scheme regulating them belong to the generator of the energy. See id.

time when it purchases the certificates, without any additional benefit to ratepayers.[24] E. Holt, R. Wiser & M. Bolinger, supra, pp. xi–xii; see also *In re Ownership of Renewable Energy Certificates*, supra, 489 (assignment of certificates to utilities adds value to electricity received by utilities, but this windfall resulted not from modification of purchase contracts but from legislative policy of reducing rates paid by consumers); id., 489–90 (assignment of certificates to renewable energy facility would result in higher rates to consumers who already have paid for electricity).

In the present case, the department concluded that the utility was entitled to the certificates because "the 'electricity' that [the plaintiff] offered to sell and that the [d]epartment ordered [the utility] to purchase necessarily meant electricity generated by renewable fuel. No other electricity generated by [the plaintiff] would have qualified [the plaintiff] for the . . . statutory and regulatory treatment [that] it [had] received. [The federal act] alone would not have qualified [the plaintiff] for [this] treatment . . . ." Specifically, "[n]othing in [the federal act] provides for the exemption from bidding and unique regulatory treatment regarding renewable resources and resource recovery facilities, under which [the plaintiff] sought and received [d]epartment approval." In addition, the department's regulations, and not federal law, authorized the approval of the 1991 agreement even though the utility did not have a demonstrated need for additional capacity.

---

[24] On the other hand, the following arguments in favor of awarding the certificates to the renewable energy sources have been made: (1) the fact that utilities are obligated to purchase energy from renewable energy facilities does not mean that purchase contracts necessarily convey the certificates to the utilities because being such a facility is merely a qualifying characteristic that makes the facility eligible for such contracts; (2) conveying the certificates to the utilities would result in a windfall to them; and (3) utilities and ratepayers benefit from the use of renewable energy even if the certificates are not conveyed to the utilities. E. Holt, R. Wiser & M. Bolinger, supra, pp. xi–xiii.

We conclude that the department's interpretation of §§ 16-243a and 16-245a is consistent with the policies underlying the statutes and the department's regulations, and was reasonable. Specifically, the department reasonably concluded that the plaintiff qualified for the regulatory treatment that it received in the 1991 proceeding because it had agreed to *sell* renewable energy to the utility, and not merely because of its status as a *producer* of renewable energy. There is legal and factual support for the conclusions that the avoided cost rate itself was intended to provide an incentive to develop renewable energy sources; *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, supra, 461 U.S. 406;[25] and that the state regulatory exemptions from the standard bidding requirements and the regulatory requirement that the utility have a demonstrated need for additional capacity were intended to provide an additional benefit to resource recovery facilities, all at the expense of the utilities and their customers.[26] If

[25] We recognize that this conclusion arguably is inconsistent with the conclusion of the federal commission in *In re Covanta Energy Group*, supra, 105 F.E.R.C. 61,007, that avoided costs were not intended to include the renewable attribute of the energy under federal law. We note, however, that the federal commission was split on that issue, that portion of the decision has been subject to some criticism; see E. Holt, R. Wiser & M. Bolinger, supra, p. 51; the only state court to confront the issue before this court declined to follow the federal commission's decision; see *In re Ownership of Renewable Energy Certificates*, supra, 389 N.J. Super. 490–91; and the federal commission's decision appears to be inconsistent with the United States Supreme Court's determination that the avoided cost scheme was intended to provide an incentive to develop renewable energy sources. *American Paper Institute, Inc.* v. *American Electric Power Service Corp.*, supra, 461 U.S. 406.

[26] As we have indicated, in addition to bringing this state action, the plaintiff, along with Minnesota Methane, LLC, brought an action in the United States District Court for the District of Connecticut, challenging the department's decision on several grounds. See footnote 16 of this opinion. Addressing the plaintiff's claim under the contracts clause of the federal constitution, the District Court concluded that "[t]he [department] took into consideration the renewable attribute [of the electricity] when approving the [1991 agreement], including those terms that were favorable to the generators due to the renewable attribute of the energy they produced. The

the renewable attribute of the energy, represented by the certificates, were not included in the avoided cost rate, then the utility would be required to purchase the certificates in order to comply with § 16-245a, thereby providing an additional, unbargained-for benefit to the plaintiff, again at the expense of the utility and ratepayers.[27] The department expressly recognized in the 1985 decision and order that an important public policy underlying the state's adoption of the mandates of the federal act was to protect ratepayers and to ensure that any agreements that the utility entered into would provide net benefits to ratepayers.

Moreover, the term "unbundling" itself implies that the renewable attribute of the energy generated by renewable energy sources is an inherent attribute of the energy, and, therefore, the creation and state recognition of the certificates did not result in an entirely new commodity but in the splitting of a preexisting commodity, i.e., "electricity," that the utility had con-

[department] later determined that the renewable attribute of the transferred energy, now monetized in the form of [the renewable energy certificates], must be transferred to [the utility]. That determination, an interpretation of the [1991 agreement], does not impair the original [agreement]." *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, No. 3:04CV1436, 2006 U.S. Dist. LEXIS 455571, *30 (D. Conn. June 23, 2006).

[27] In the companion case of *Minnesota Methane, LLC* v. *Dept. of Public Utility Control*, 283 Conn. 700, 931 A.2d 177 (2007), the plaintiff, Minnesota Methane, LLC (Minnesota Methane), which is a "small renewable power project" as defined by General Statutes § 16-243b (a) (6), initially represented at oral argument to this court that the utility would be entitled to credit for the purchase of renewable energy under § 16-245a even if the utility did not receive the certificates associated with the energy. The department and the utility responded that that would result in double counting because both the utility and the entity to which Minnesota Methane sold the certificates would receive credit for the renewable energy, and that this was inconsistent with the underlying public policy of promoting the development of renewable energy sources. During rebuttal argument, Minnesota Methane appeared to withdraw its initial claim.

tracted to purchase.[28] It was reasonable, therefore, for the department to conclude that the word "electricity," as used in § 16-243a (c) and the 1991 agreement, meant renewable energy. In other words, the term "electricity" necessarily included the renewable attribute that later was "unbundled" from the energy and represented by the certificates. Accordingly, we conclude that the department reasonably determined that the certificates were owned by the utility.

## III

Finally, we address the plaintiff's claim that the trial court incorrectly concluded that the department's decision that the utility was entitled to the renewable energy certificates did not violate article first, § 11, of the Connecticut constitution.[29] The plaintiff argues that the department's "substitution of its dominion over the [certificates] for [the] plaintiff's control over the property is a taking without compensation." We disagree.

Whether the department's decision amounted to an unconstitutional taking is a question of law over which our review is plenary. See, e.g., *184 Windsor Avenue, LLC* v. *State*, 274 Conn. 302, 320 n.20, 875 A.2d 498 (2005). Article first, § 11, of the Connecticut constitution provides that "[t]he property of no person shall be

[28] In support of the 2004 petition, the utility submitted to the department certain educational materials concerning the certificate program. These materials explained that the "[c]oncept of [u]nbundling" was intended to "[*separate*] the environmental attributes of electric power from the energy commodity"; (emphasis added); resulting in two commodities: (1) energy; and (2) environmental attributes, represented by the tradable certificates.

[29] In the plaintiff's action in the United States District Court for the District of Connecticut; see footnotes 16 and 26 of this opinion; the plaintiff claimed, inter alia, that the department's decision violated the takings clause of the fifth amendment to the United States constitution. See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, No. 3:04CV1436, 2006 U.S. Dist. LEXIS 455571, *2, *30 (D. Conn. June 23, 2006). The District Court concluded that, because the department had concluded that the utility owns the certificates, the plaintiff was not deprived of any property interest. Id., *31.

taken for public use, without just compensation therefor." An unconstitutional "taking occurs when there is a substantial interference with private property which destroys or nullifies its value or by which the owner's right to its use or enjoyment is in a substantial degree abridged or destroyed." (Internal quotation marks omitted.) *Tamm* v. *Burns*, 222 Conn. 280, 284, 610 A.2d 590 (1992).

The trial court concluded in the present case that the transfer of the certificates to the utility did not constitute an unconstitutional taking of property from the plaintiff because the certificates were not the plaintiff's property. We have concluded that the trial court correctly determined that it was within the jurisdiction of the department to determine the ownership of the certificates and that the department reasonably concluded that the utility owned them. Accordingly, we agree with the trial court that the department's decision could not constitute an unconstitutional taking under the state constitution because no property owned by the plaintiff had been taken.

The judgment is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status as of the date of oral argument.