******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KLEEN ENERGY SYSTEMS, LLC *v.* COMMISSIONER
OF ENERGY AND ENVIRONMENTAL
PROTECTION
(SC 19362)

Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued April 21—officially released November 3, 2015*

*Michael A. Kurs*, with whom were *Lee D. Hoffman*
and, on the brief, *Megan Youngling Carannante*, for

the appellant (plaintiff).

*Seth A. Hollander*, assistant attorney general, with whom were *Clare E. Kindall*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Gregory D'Auria*, solicitor general, for the appellee (defendant).

*Vincent P. Pace*, for the appellee (intervening defendant Connecticut Light and Power Company).

*Joseph A. Rosenthal*, for the appellee (intervening defendant Office of Consumer Counsel).

*Opinion*

ESPINOSA, J. The issue in this appeal is whether the defendant, the Commissioner of Energy and Environmental Protection, acting through the Public Utilities Regulatory Authority (authority),[1] had jurisdiction to resolve a dispute between the parties to a contract relating to the provision of electrical capacity. Pursuant to General Statutes § 16-243m,[2] the authority conducted a proceeding to develop a form contract between electric distribution companies and generators of electrical capacity for the purpose of reducing certain federally mandated charges to consumers. The plaintiff, Kleen Energy Systems, LLC, an electric generating facility, entered into such a contract with Connecticut Light and Power Company (power company), an electric distribution company. Thereafter, a dispute arose concerning the proper interpretation of the contract's pricing provision. Pursuant to the request of Waterside Power, LLC (Waterside), which had entered into a similar contract with the power company, the authority conducted proceedings to resolve the dispute. The plaintiff was a participant in, but not a party to, those proceedings. After the authority issued a decision resolving the dispute, Waterside filed a petition for a declaratory ruling in which it challenged the decision. The authority issued a declaratory ruling denying the relief sought by Waterside. The plaintiff then filed an administrative appeal from the authority's ruling in which it claimed, among other things, that it had a contractual right to submit the dispute to arbitration and that the authority lacked jurisdiction to issue a declaratory ruling to resolve the dispute. After a remand to the authority and an additional administrative appeal from the decision on remand, the trial court ultimately concluded that the authority had jurisdiction to issue a declaratory ruling to resolve the dispute and that the plaintiff had waived its contractual right to arbitration. The trial court also determined that the authority had properly resolved the dispute and dismissed the plaintiff's appeals. This appeal followed.[3] We conclude that the trial court improperly determined that the authority had jurisdiction to resolve the pricing dispute. Accordingly, we reverse the judgment of the trial court on that issue. Because this conclusion renders the plaintiff's appeal from the authority's decision on remand moot, we affirm the judgment of the trial court dismissing this appeal on this alternative ground.

The record reveals the following facts that were found by the trial court or that are undisputed, and procedural history. The authority is required pursuant to § 16-243m (a) to "identify those measures that can reduce federally mandated congestion charges, as defined in section 16-1,[4] and that can be implemented, in whole or in part, on or before January 1, 2006." (Footnote added.) As a general matter, federally man-

dated congestion charges arise when there is insufficient electrical capacity to meet demand in a particular area, and they are borne by consumers. Measures to reduce such charges include "contracts between an electric distribution company . . . and an owner of generation resources for the capacity of such resources." General Statutes § 16-243m (a). For purposes of § 16-243m, "capacity" is not electricity itself, but is the ability to produce electricity when required.

Pursuant to the procedures set forth in § 16-243m, the authority was required: (1) to conduct a contested case in order to establish the principles and standards to be used in developing and issuing a request for proposals to potential electrical capacity generation resources (capacity resources); General Statutes § 16-243m (b); (2) to conduct a proceeding to develop and issue a request for proposals; General Statutes § 16-243m (c); and (3) to evaluate the proposals it received. General Statutes § 16-243m (g). The authority carried out this multistep process in several proceedings, two of which are relevant to this appeal. In the first proceeding, Docket No. 05-07-14PH02, which was an uncontested case for purposes of the Uniform Administrative Procedure Act (UAPA);[5] General Statutes § 4-166 et seq.; the authority approved the final form of the contract to be used between capacity resources and electric distribution companies, known as the master agreement (master agreement proceeding). The master agreement contained a dispute resolution provision that provided for three levels of dispute resolution, culminating in binding arbitration.[6] In the second proceeding, Docket No. 07-04-24, which was a contested case for purposes of the UAPA, the authority evaluated and approved four nearly identical specific capacity contracts, including the master agreement between the plaintiff and the power company (Kleen Energy master agreement) and the master agreement between Waterbury Generation, LLC (Waterbury Generation), and The United Illuminating Company (capacity contract proceeding). In addition to the plaintiff and Waterbury Generation, Waterside and Ameresco CT, LLC, also entered into master agreements.

The master agreement approved by the authority in the master agreement proceeding contained a financial mechanism known as a "contract for differences" by which the amounts to be paid to or, in some cases, by capacity resources were to be determined.[7] In 2010, a dispute arose over the manner in which the contract for differences provision should operate under certain circumstances (capacity clearing price dispute).[8] Accordingly, notwithstanding the contractual dispute resolution provision, Waterside submitted a motion to the authority requesting that it open the master agreement proceeding and resolve the dispute in its favor. In the alternative, Waterside requested that the authority amend the master agreement to reflect the

original intent of the parties.[9]

The authority granted Waterside's motion to open the master agreement proceeding to resolve the capacity clearing price dispute, and, in Docket No. 05-07-14RE02, it combined the dispute with five other disputes that had arisen from other master agreements (combined proceeding). The authority identified the plaintiff as a participant in the combined proceeding. The authority issued a draft decision on May 4, 2011, in which it rejected the capacity resources' interpretation of the master agreement with respect to the capacity clearing price dispute. The plaintiff submitted written exceptions to this portion of the draft decision, stating that it had "an interest in this proceeding to the extent that the [authority's] ruling affects [the Kleen Energy] [m]aster [a]greement . . . ." On May 18, 2011, the authority issued its final decision in the combined proceeding, in which it again rejected the capacity resources' interpretation of the master agreement.

Thereafter, Waterside submitted to the authority a petition for a declaratory ruling, Docket No. 11-08-09, in which it challenged the authority's decision in the combined proceeding. Although Waterside had asked the authority to amend the master agreement to reflect the intent of the parties in its motion to open, Waterside now argued in its petition for a declaratory ruling that the authority was barred by § 16-243m from modifying the master agreement after its effective date. It further claimed that the decision constituted an unconstitutional taking. The plaintiff filed a motion in support of Waterside's petition in which it requested that the authority make it a party to the proceedings on the petition.[10] The authority issued a draft ruling on Waterside's petition in which it concluded that its resolution of the capacity clearing price dispute was a clarification based on the plain language of the master agreement and did not modify the terms and conditions of the agreement. Accordingly, it affirmed its decision in the combined proceeding. The plaintiff submitted a letter to the authority in lieu of written exceptions to the draft ruling in which it stated that it adopted Waterside's written exceptions in full. Thereafter, the authority issued a final decision on Waterside's petition for a declaratory ruling that was substantially similar to its draft decision.

The plaintiff then appealed from the authority's declaratory ruling to the trial court. General Statutes § 4-183. The Office of Consumer Counsel and the power company filed motions to intervene as party defendants in the plaintiff's appeal, which the trial court granted.[11] The plaintiff claimed, among other things, that the authority had "exceeded and abused its authority by failing to require the parties to submit to the dispute resolution provisions of [§ 12.10] of the [m]aster [a]greement."[12] During a status conference on the

administrative appeal, the trial court requested that the parties submit briefs on the question of whether the matter "might need to be remanded to the [authority] for further action" to determine whether the parties were required to proceed under the dispute resolution procedures set forth in § 12.10 of the Kleen Energy master agreement. Thereafter, the trial court ordered that the matter be remanded to the authority for consideration of that issue.

The plaintiff then filed a motion to stay the pending administrative appeal pursuant to General Statutes § 52-409[13] and to compel arbitration of the capacity clearing price dispute pursuant to General Statutes § 52-410 (a).[14] The trial court denied the motion on the ground that, acting in its capacity as an appellate tribunal in an administrative appeal, it did not have the authority to rule on the motion. The trial court also indicated, however, that it would be willing to continue the appellate proceedings in order to provide the plaintiff with an opportunity to file an application pursuant to § 52-410 in a separate proceeding.

On November 15, 2012, the authority issued its decision pursuant to the remand order of the trial court in the administrative appeal on the question of whether the parties were required to proceed pursuant to the dispute resolution procedures of the Kleen Energy master agreement. The authority concluded that the plaintiff had waived its rights under that provision by failing to raise them in a timely manner, by participating in the combined proceeding and the proceeding on the declaratory ruling, and by failing to object to the propriety of those proceedings. Thereafter, on December 28, 2012, the plaintiff appealed from that decision to the trial court, and that appeal was consolidated with the plaintiff's initial appeal from the authority's declaratory ruling on the capacity clearing price dispute. The Office of Consumer Counsel and the power company also intervened as party defendants in this second appeal.

On December 28, 2012, the plaintiff also filed an application to compel arbitration in the Superior Court for the judicial district of Middlesex (action to compel arbitration). The trial court in the action to compel arbitration ultimately stayed the action, however, pending resolution of the administrative appeal. The court reasoned that allowing the action to compel arbitration to proceed while the administrative appeal was pending would potentially give rise to " 'forum shopping' " or to inconsistent judgments. The court further reasoned that it was likely that the issues to be raised in the arbitration proceedings would be resolved in the administrative appeal, thereby resulting in administrative res judicata.

Thereafter, the trial court in the administrative appeals concluded that the authority had jurisdiction both to determine whether the plaintiff had waived its

contractual right to arbitrate the capacity clearing price dispute and to resolve the merits of that dispute in proceedings on a petition for a declaratory ruling pursuant to General Statutes § 4-176 (a). The court further concluded that the authority properly had determined that the plaintiff had waived its contractual right to arbitration and that the authority properly had resolved the capacity clearing price dispute. Accordingly, it dismissed the plaintiff's appeals. This appeal followed.

The plaintiff contends on appeal that the trial court improperly determined that: (1) the authority did not violate the plaintiff's contractual right to arbitrate the capacity clearing price dispute; (2) the plaintiff waived its contractual right to arbitrate the dispute; (3) the authority had jurisdiction to rule on the arbitrability of the dispute; (4) the authority had jurisdiction pursuant to § 4-176 (a) to issue a declaratory ruling resolving the dispute; and (5) the authority did not violate the plaintiff's constitutional due process rights. We conclude that the authority lacked jurisdiction to resolve the capacity clearing price dispute. Because this conclusion is dispositive, we need not address the plaintiff's other claims.

We begin our analysis with the standard of review. "Administrative agencies are tribunals of limited jurisdiction and their jurisdiction is dependent entirely [on] the validity of statutes vesting them with power and they cannot confer jurisdiction [on] themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions, under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 685, 931 A.2d 159 (2007).

"[A] subject matter jurisdictional defect may not be waived . . . [or jurisdiction] conferred by the parties, explicitly or implicitly. . . . [T]he question of subject matter jurisdiction is a question of law . . . and, once raised, either by a party or by the court itself, the question must be answered before the court may decide the case. . . . We have long held that because [a] determination regarding . . . subject matter jurisdiction is a question of law, our review is plenary."[15] (Internal quotation marks omitted.) Id.

Section 4-176 (a) provides: "Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency." The defendants contend that the authority had jurisdiction to issue a declaratory

ruling on the capacity clearing price dispute pursuant to § 4-176 because: (1) the ruling required the authority to apply its decision in the master agreement proceeding to the specific circumstances of the capacity clearing price dispute; and (2) the ruling required the authority to apply § 16-243m to those circumstances. We disagree.

We first address the defendants' claim that the authority had jurisdiction to issue the declaratory ruling because it was applying its decision in the master agreement proceeding, in which the authority approved the form of the master agreement, to the specific circumstances involved in the capacity clearing price dispute. As we have indicated, § 4-176 (a) provides that an agency may issue a declaratory ruling on the "applicability to specified circumstances of . . . a *final decision* on a matter within the jurisdiction of the agency." (Emphasis added.) Section 4-166 (5) defines in relevant part a " '[f]inal decision' " for purposes of the UAPA as "(A) the agency determination in a contested case, (B) a declaratory ruling issued by an agency pursuant to section 4-176, or (C) an agency decision made after reconsideration. . . ." See also General Statutes § 16-9 ("[a]ny final decision, order or authorization of the [authority] in a contested case shall constitute a final decision for the purposes of [the UAPA]"). Because the master agreement proceeding did not involve a contested case, a declaratory ruling or an agency decision made after reconsideration, it did not result in a "final decision" for purposes of § 4-176 (a). Accordingly, we conclude that the authority did not have statutory authority to issue a declaratory ruling applying its decision in the master agreement proceeding to the capacity clearing price dispute.

The authority further contends that, because it approved the Kleen Energy master agreement in a contested case, the capacity contract proceeding, the decision was a "final decision" for purposes of § 4-176 (a) and, therefore, it had jurisdiction to apply that decision in the proceeding on the petition for a declaratory ruling. The authority's initial decision on the capacity clearing price dispute was issued, however, in the combined proceeding, the proceeding in which the authority had opened the master agreement proceeding, which was not a contested case. Presumably, Waterside had requested the authority to open that specific proceeding to resolve the capacity clearing price dispute because the dispute required the authority to interpret and apply the form master agreement, which was the subject of the master agreement proceeding, not to evaluate whether specific capacity resources were qualified to execute the master agreement, which was the subject of the capacity contract proceeding.[16] In turn, the authority's declaratory ruling related solely to the issues that had been decided in the combined proceeding, and the authority expressly reaffirmed its decision in the

combined proceeding in its declaratory ruling. Because the authority did not apply its decision in the capacity contract proceeding to the circumstances of the capacity clearing price dispute when it issued its declaratory ruling, we reject this claim.

We next address the defendants' claim that the authority had jurisdiction to issue a declaratory ruling on the capacity clearing price dispute because it was applying the provisions of a statute within its jurisdiction to the circumstances of the dispute. See General Statutes § 4-176 (a) (agency is authorized to issue "declaratory ruling as to . . . the applicability to specified circumstances of a provision of the general statutes"). Specifically, the Office of Consumer Counsel points out in its brief to this court that, pursuant to § 16-243m (e), the master agreement was required to transfer "all the rights to the installed capacity . . . locational forward reserve capacity and similar rights" from capacity resources to electrical distribution companies and, pursuant to § 16-243m (f), "[e]ach person submitting a proposal pursuant to this section shall agree to forgo or credit reliability must run payments, locational installed capacity payments or payments for similar purposes . . . ." In addition, the power company points out in its brief that § 16-243m (i) provides in relevant part that the master agreement must "(1) result in the lowest reasonable cost of such . . . services, (2) increase reliability, and (3) minimize federally mandated congestion charges to the state over the life of the contract. . . ." The authority did not rely on or even refer to these provisions, however, either in its decision in the combined proceeding or in its declaratory ruling. Rather, the authority relied exclusively on the plain language of the master agreement's pricing provision, the form of which was not dictated by § 16-243m.[17]

The defendants further rely on this court's decision in *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 672, and a decision of the Superior Court, *Minnesota Methane, LLC* v. *Dept. of Public Utility Control*, Superior Court, judicial district of New Britain, Docket No. CV-04-0527217-S (March 20, 2006) (unpublished opinion), aff'd, 283 Conn. 700, 931 A.2d 177 (2007), to support their position that the authority has jurisdiction to interpret a contract that it has approved in a decision. We conclude that those cases are distinguishable. In *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 679–81, the plaintiff, Wheelabrator Lisbon, Inc. (Wheelabrator), entered into a contract to sell electricity to the power company, which the Department of Public Utility Control (department) then approved in a proceeding pursuant to General Statutes (Rev. to 1991) § 16-243a and the department's implementing regulations. Thereafter, a dispute arose as to whether the electricity that Wheelabrator had agreed to sell included the right to certain

renewable energy certificates. Id., 682–83. Wheelabrator claimed that the department lacked jurisdiction to resolve the dispute pursuant to § 4-176 because the dispute involved "a question of the intent of the parties under a privately negotiated agreement, and no state statute confers jurisdiction on the department to decide such an issue." Id., 684. We concluded that the resolution of the issue turned on "(1) whether the legislature intended that the word 'electricity' in the phrase 'rates for electricity purchased from a private power producer . . . based on the full avoided costs' in General Statutes [(Rev. to 1991)] § 16-243a (c) . . . include the renewable energy component represented by the certificates or, instead, meant generic electricity without the renewable energy component, and (2) whether the electricity that the utility purchased at the avoided cost rate should be applied to its renewable energy portfolio requirement under [General Statutes] § 16-245a (a), or, instead, the utility should be required to purchase *both* the electricity *and* the certificates to meet the requirement." (Emphasis in original.) Id., 688–89. Because the department was charged with implementing those statutes, we concluded that the department had jurisdiction to resolve the dispute pursuant to § 4-176. Id., 686–87; id., 687 ("the meaning of the agreement's pricing provisions . . . is more a question of legislative intent and public policy than a question of the intent of the parties"). In contrast, as we have explained, the resolution of the capacity clearing price dispute in the present case did not require the authority to construe or apply any specific statutory provision.[18] Accordingly, the reasoning in *Wheelabrator Lisbon*, *Inc.*, does not apply here.

*Minnesota Methane, LLC* v. *Dept. of Public Utility Control*, supra, Superior Court, Docket No. CV-04-0527217-S, involved the same issue as *Wheelabrator Lisbon, Inc.* The trial court in that case concluded broadly that that the department had jurisdiction under § 4-176 to resolve any disputes arising under a contract that the department had approved in a "decision . . . ." Id. On appeal to this court, however, we affirmed the judgment of the trial court on the basis of the same reasoning that we had applied in *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 688–89, namely, that the department had jurisdiction to issue a declaratory ruling pursuant to § 4-176 because it was required to construe and apply General Statutes (Rev. to 2003) § 16-243a and General Statutes (Rev. to 2003) § 16-245a to resolve the dispute. *Minnesota Methane, LLC* v. *Dept. of Public Utility Control*, 283 Conn. 700, 712, 931 A.2d 177 (2007). For the reasons that we have explained, to the extent that the trial court's decision in *Minnesota Methane, LLC*, suggests that the department has broad authority to issue declaratory rulings pursuant to § 4-176 whenever it is asked to interpret a contract that it was involved in drafting, even if the contract was not approved in a contested

case and the dispute did not require the department to apply a statute to the specific circumstances of the contractual dispute, we reject any such interpretation.[19]

Finally, the defendants claim that, even if the authority did not have jurisdiction to issue a declaratory ruling to resolve the capacity clearing price dispute pursuant to § 4-176, it had jurisdiction to determine whether the master agreement should be modified to reflect the original intent of the parties pursuant to § 16-9. See General Statutes § 16-9 ("authority may, at any time, for cause shown, upon hearing had after notice to all parties in interest, rescind, reverse or alter any decision, order or authorization by it made"). We cannot conclude, however, that § 16-9 was intended to confer jurisdiction on the authority to unilaterally alter a "decision" approving the form of a contract *after* private parties have agreed to its terms, at least not in the absence of any express statutory provision mandating the form of the contract or conferring continuing jurisdiction on the authority to modify it. Such an interpretation would potentially allow the authority to impair vested contractual rights and, accordingly, must be rejected as constitutionally suspect.[20] See U.S. Const., art. I, § 10 ("[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts"); *Columbia Air Services, Inc.* v. *Dept. of Transportation*, 293 Conn. 342, 359, 977 A.2d 636 (2009) (legitimate claim of entitlement to contractual right constitutes protectable property interest for purposes of constitutional due process provisions); *Ramos* v. *Vernon*, 254 Conn. 799, 816, 761 A.2d 705 (2000) ("fundamental principle of statutory interpretation . . . dictates that we read legislation to avoid, rather than raise, constitutional challenges"); cf. *Pineman* v. *Oechslin*, 195 Conn. 405, 414, 488 A.2d 803 (1985) ("permitting unilateral modification of [a] . . . contract by the state . . . defies the basic contract law tenet that modification requires mutual assent" [internal quotation marks omitted]). Moreover, nothing in § 16-9 confers jurisdiction on the authority to exercise the equitable power to reform a contract to conform to the true intent of the parties. See *Lopinto* v. *Haines*, 185 Conn. 527, 531, 441 A.2d 151 (1981) ("[a] cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed upon and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual or constructive fraud, or inequitable conduct on the part of the other" [internal quotation marks omitted]). A contract reformation does not "alter" the terms of a contract, as would be required for the authority to have jurisdiction pursuant to § 16-9, but conforms the writing to the actual contractual intent. Id., 532.

Indeed, in an attachment to its decision in the master agreement proceeding approving the form of the master

agreement, the authority stated that, "in response to bidder calls for having an objective third party serve as an arbiter of these *commercial*, [*nonregulated contracts*], [the authority] has removed itself as much as possible from serving . . . in a dispute resolution role." (Emphasis added.) Although the term nonregulated is not defined, it is reasonable to conclude that the authority was acknowledging that, after it approved the form of the master agreement and specific parties executed specific master agreements, the authority would no longer have any regulatory authority to set the terms of the master agreement.[21] Cf. *Freehold Cogeneration Associates, L.P.* v. *Board of Regulatory Commissioners*, 44 F.3d 1178, 1192 (3d Cir.) (attempt by Board of Regulatory Commissioners to modify contract that it previously had approved constituted utility-type regulation), cert. denied sub nom. *Jersey Central Power & Light Co.* v. *Freehold Cogeneration Associates, L.P.*, 516 U.S. 815, 116 S. Ct. 68, 133 L. Ed. 2d 29 (1995). Moreover, the authority concluded in its declaratory ruling that it could not "modify the [master agreement] after the effective date except as provided for in the [master] [a]greement[22] or law"; (footnote added); and it identified no law authorizing it to modify the agreement. Thus, the authority effectively conceded that § 16-9 itself did not confer jurisdiction to "alter" the Kleen Energy master agreement if the authority otherwise lacked statutory authority to modify the terms of the contract or implicit authority to conform them to an express statutory mandate.[23]

In addition, the defendants again rely on this court's decision in *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 689, to support their claim that the authority had jurisdiction to resolve the capacity clearing price dispute pursuant to § 16-9. See id. ("[w]e see no reason to conclude that the department lacked jurisdiction to make these determinations [regarding the ownership of the renewable energy certificates] under §§ 4-176 and 16-9"). As we have explained, however, the issue under review in *Wheelabrator Lisbon, Inc.*, was "more a question of legislative intent and public policy than a question of the intent of the parties" to the relevant contract; id., 687; and resolution of the issue required the department to interpret certain specific statutory provisions that it was charged with implementing. In other words, the meaning of the contract provision depended on, and was required to be consistent with, the meaning of specific statutory provisions. Thus, if the department in *Wheelabrator Lisbon, Inc.*, had determined that the contract provision under review was *inconsistent* with the statutory provisions, the parties were constructively on notice that the provision must be altered to conform to the statutes.[24] See footnote 21 of this opinion. In contrast, in the present case, the contract for differences provision of the master agreement was not dic-

tated by any specific statutory provision, and resolution of the capacity clearing price dispute did not require the authority to interpret or to apply the language of any specific statutory provision. Thus, as we have explained, the meaning and application of the contract for differences provision was not primarily a matter of legislative intent regarding the form of contracts between electric distribution companies and capacity resources. Accordingly, our decision in *Wheelabrator Lisbon, Inc.*, is not controlling here.

Because we have concluded that the authority lacked jurisdiction to issue a declaratory ruling to resolve the capacity clearing price dispute pursuant to § 4-176 or to resolve the dispute pursuant to § 16-9, there is no need to address the plaintiff's other claims on appeal. Even if we were to assume that the plaintiff's conduct would have constituted a waiver of its right to arbitrate the capacity clearing price dispute if the authority had had jurisdiction to resolve the dispute, the plaintiff's conduct could not confer jurisdiction on the authority that it otherwise would lack. Thus, the plaintiff's claims that the trial court improperly remanded the case to the authority to resolve the waiver issue and that the authority improperly determined that the plaintiff had waived its right to arbitration are moot.[25] Finally, because our decision effectively nullifies the authority's decision in the combined proceeding and its declaratory ruling, we need not address the question of whether those rulings violated the plaintiff's constitutional right to due process.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment sustaining the plaintiff's appeal from the authority's declaratory ruling; the judgment dismissing the plaintiff's appeal from the authority's order on remand is affirmed.

In this opinion the other justices concurred.

[1] The Commissioner of Energy and Environmental Protection oversees the Department of Energy and Environmental Protection, which was established by the legislature while the administrative proceedings that culminated in this appeal were pending. The Department of Energy and Environmental Protection was the successor agency to the Department of Environmental Protection and the Department of Public Utility Control. See Public Acts 2011, No. 11-80, § 1 (a). The legislature also designated the authority as the replacement for the Department of Public Utility Control, effective July 1, 2011. Public Act 11-80, § 1 (e).

[2] Although § 16-243m has been amended by the legislature several times since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-94, § 48; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 16-1 (a) (35) defines " '[f]ederally mandated congestion charges' " as "any cost approved by the Federal Energy Regulatory Commission as part of New England Standard Market Design including, but not limited to, locational marginal pricing, locational installed capacity payments, any cost approved by the Public Utilities Regulatory Authority to reduce federally mandated congestion charges in accordance with section

. . . 16-245m . . . .”

Although § 16-1 (a) has been amended by the legislature since the events underlying the present case; see, e.g., Public Acts 2014, No. 14-134, § 1; those amendments have no bearing on the merits of this appeal. For convenience, we refer to the current revision of the statute.

[5] General Statutes § 4-166 (4) defines " '[c]ontested case' " as "a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by state statute or regulation to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but does not include proceedings on a petition for a declaratory ruling under section 4-176, hearings referred to in section 4-168 or hearings conducted by the Department of Correction or the Board of Pardons and Paroles . . . ."

[6] Section 12.10 of the master agreement provides in relevant part that "[e]xcept as otherwise expressly set forth herein, for any and all disputed issues, the [p]arties shall refer to this [§] 12.10 . . . ." Under § 12.10 (a) of the master agreement, the first step of dispute resolution is negotiation between the executives of the respective parties to the agreement. Section 12.10 (a) also requires the parties to give notice to the authority of "any dispute not resolved in the normal course of business . . . ." If these negotiations are unsuccessful, § 12.10 (b) requires the parties to enter into mediation. If this step is also unsuccessful, § 12.10 (c) requires the parties to submit the dispute to binding arbitration.

[7] The contract for differences is a highly complex financial arrangement. Although a full understanding of its operation is not required for purposes of this opinion, we offer the following brief summary. ISO New England, Inc. (ISO New England), is an "independent, not-for-profit corporation responsible for keeping electricity flowing across the six New England states and ensuring that the region has reliable, competitively priced wholesale electricity today and into the future." ISO New England, Inc., "About Us," available at http://www.iso-ne.com/about (last visited October 9, 2015). To further its mission, ISO New England operates a forward capacity market and conducts annual forward capacity auctions in which capacity resources compete "to obtain a commitment to supply capacity in exchange for a market-priced capacity payment." ISO New England, Inc., "Forward Capacity Market," available at http://www.iso-ne.com/markets-operations/markets/forward-capacity-market (last visited October 9, 2015). The authority's decision approving the Kleen Energy master agreement states that, under the contract for differences financial arrangement, "the contract will have a variable payment structure incorporating the [forward capacity market] and [locational forward reserve market] payments already in place. Bidders will submit a [f]inancial [b]id in [dollar per kilowatt] per annum terms, referred to as the [a]nnual [c]ontract [p]rice. This price, along with market clearing prices in the [forward capacity market] and the [locational forward reserve market] (at the option of the [b]idder), will be used to settle the monthly payments between the contract counterparties. If the [a]nnual [c]ontract [p]rice is above the actual market clearing price in the [forward capacity market] and, if elected, the [locational forward reserve market], the [b]uyer will true up the [s]upplier, by paying the difference between the [a]nnual [c]ontract [p]rice and market clearing prices in the [f]orward [c]apacity [a]uction . . . and the [f]orward [r]eserve [a]uction . . . with some adjustments, thus ensuring a stable stream of revenue to the [s]upplier. If the [a]nnual [c]ontract [p]rice is lower than actual market clearing prices, the [s]upplier will make payments to the [b]uyer, based on the difference between the [a]nnual [c]ontract [p]rice and the market clearing prices, subject to certain adjustments."

[8] Because the details of this dispute have no bearing on the claims that we are required to resolve in this appeal, a full understanding of the dispute is not required. Briefly stated, the dispute concerned what should happen when the annual forward capacity auction conducted by ISO New England, Inc. (ISO New England); see footnote 7 of this opinion; clears at the floor price. In the 2010–2011 auction, the capacity clearing price reached the floor price of $4.50 per kilowatt with excess capacity still remaining. In other words, there were more capacity resources supplying bids than ISO New England wished to accept. Accordingly, pursuant to its rules governing forward capacity auctions, ISO New England adjusted the floor clearing price by "clearing" all available capacity and prorating payment to all capacity resources that had cleared at the price, thereby reducing the actual price paid to capacity resources to $4.25 per kilowatt. The capacity resources complained that, "if the non-prorated [c]apacity [c]learing [p]rice is utilized

to determine the capacity portion of the [m]onthly [p]ayment [a]mount instead of the [p]ayment [r]ate, there will be a disconnect between a [s]upplier's actual revenues from [ISO New England] for capacity and the [forward capacity auction] [m]arket [p]rice. Specifically, the [s]upplier will be credited with sums that it never received, thereby causing the [s]upplier to pay too much or receive too little in the contractually mandated true-up process."

[9] Section 12.8 (b) of the master agreement provides in relevant part that, "[e]xcept to the extent herein provided for, no amendment or modification to this [a]greement shall be enforceable unless reduced to writing, approved by the [authority], and executed by both [p]arties."

[10] It is unclear from the record whether the authority ever ruled on the plaintiff's request to be made a party to the proceeding on Waterside's petition for a declaratory ruling. It appears, however, that the authority consistently treated the plaintiff as a participant in the proceeding.

[11] References hereinafter to the defendants, collectively, are to the authority, acting on behalf of the defendant, the Commissioner of Energy and Environmental Protection, and the intervening defendants, the Office of Consumer Counsel and the power company.

Waterbury Generation intervened as a party plaintiff only in the plaintiff's administrative appeal to the trial court from the authority's declaratory ruling, but has not participated in this appeal from the judgment of the trial court and, unless otherwise indicated, all references to the plaintiff in this opinion are to Kleen Energy Systems, LLC.

Waterside filed a separate appeal from the authority's declaratory ruling. The trial court in that appeal concluded that the authority had reasonably resolved the capacity clearing price dispute and, accordingly, it dismissed Waterside's appeal.

[12] While the appeal was pending, the plaintiff submitted a letter to the authority stating that, pursuant to § 12.10 of the Kleen Energy master agreement, it was providing initial notice that it disputed the power company's interpretation of the Kleen Energy master agreement with respect to the capacity clearing price dispute. See footnote 6 of this opinion. In response, the power company wrote a letter to the plaintiff in which it stated that no dispute between the parties existed because the authority had already resolved the capacity clearing price dispute in the proceedings on Waterside's request for a declaratory ruling. The power company also stated that the issue of whether the authority had authority to resolve the dispute or, instead, it should have been submitted to alternative dispute resolution was currently pending before the trial court in the plaintiff's administrative appeal. Accordingly, the power company asked the plaintiff to withdraw its request for alternative dispute resolution pending the trial court's decision.

[13] General Statutes § 52-409 provides: "If any action for legal or equitable relief or other proceeding is brought by any party to a written agreement to arbitrate, the court in which the action or proceeding is pending, upon being satisfied that any issue involved in the action or proceeding is referable to arbitration under the agreement, shall, on motion of any party to the arbitration agreement, stay the action or proceeding until an arbitration has been had in compliance with the agreement, provided the person making application for the stay shall be ready and willing to proceed with the arbitration."

[14] General Statutes § 52-410 (a) provides: "A party to a written agreement for arbitration claiming the neglect or refusal of another to proceed with an arbitration thereunder may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, to any judge thereof, for an order directing the parties to proceed with the arbitration in compliance with their agreement. The application shall be by writ of summons and complaint, served in the manner provided by law."

[15] The authority relies on *Albright-Lazzari* v. *Freedom of Information Commission*, 136 Conn. App. 76, 44 A.3d 859, cert. denied, 305 Conn. 927, 47 A.3d 886 (2012), for the proposition that courts must defer to an agency's determination as to whether it has jurisdiction over a given matter pursuant to a particular statute if that determination is time-tested and reasonable. See id., 82–83 ("[w]e have determined . . . that we will defer to an agency's interpretation of a statutory term only when that interpretation of the statute previously has been subjected to judicial scrutiny or to a governmental agency's time-tested interpretation and is reasonable" [internal quotation marks omitted]); id., 84–87 (deferring to determination of Freedom of Infor-

mation Commission [commission] that it lacked jurisdiction to determine whether plaintiffs had right to access records of Department of Children and Families because determination was time-tested and reasonable). We disagree. Although the Appellate Court in *Albright-Lazzari* characterized the issue before it as implicating the commission's subject matter jurisdiction, the court was actually reviewing the commission's ruling on the meaning and scope of certain statutes governing access to public records, which the commission clearly had the authority and expertise to interpret in the first instance. Id. Accordingly, it is debatable whether the ruling truly implicated the commission's subject matter jurisdiction. Cf. *In re Jose B.*, 303 Conn. 569, 579–80, 34 A.3d 975 (2012) ("the purported distinction between a tribunal's action [that] exceeds its statutory authority, which we have treated as implicating the tribunal's jurisdiction, and a tribunal's action [that] misconstrues its statutory authority, which we have treated as involving the proper construction of the statute . . . has proven illusory in practice" [citation omitted; internal quotation marks omitted]). In the present case, the interpretation of § 4-176, which is part of the UAPA, is not a matter within the authority's special authority or expertise. Moreover, the authority makes no claim that its interpretation of the statute is time-tested and reasonable. Accordingly, we conclude that the authority's interpretation of § 4-176 is not entitled to deference.

[16] We recognize that the authority discussed issues that had been resolved in the master agreement proceeding in its decision in the capacity contract proceeding, including the justification for the contract for differences provision. The authority stated in its decision in the capacity contract proceeding, however, that it had "limited the scope [of] this proceeding in an attempt to prevent revisiting issues about assumptions and evaluation methodologies that were previously discussed, decided, and then relied on in [the master agreement proceeding]," because "the [authority] did not want to have a 'battle of experts' in this contested case proceeding regarding issues that had long ago been decided . . . in the past uncontested case . . . ." Although the authority somewhat reluctantly allowed the Office of Consumer Counsel and other participants in the capacity contract proceeding to present evidence and arguments relating to the form of the master agreement that had been approved in the master agreement proceeding, including the contract for differences provision, that was not the purpose of the proceeding and the authority ultimately declined to revisit its earlier decision. Indeed, as the authority expressly recognized, the participants in the capacity contract proceeding had relied on the finality of the authority's decision in the master agreement proceeding. In any event, even if the authority *could have* issued a declaratory ruling applying its decision in the capacity contract proceeding to the specific circumstances involved in the capacity clearing price dispute that is not what it actually did. Rather, as we have indicated, it applied its decision in the combined proceeding, which was not a final decision for purposes of § 4-176.

[17] The authority points out that it stated in its decision in the capacity contract proceeding that the contract for differences was "the preferred approach in the context of the [ISO New England, Inc., markets] [see footnote 7 of this opinion] and [ISO New England, Inc.] [m]arket [r]ules and complies with the legislative intent to procure capacity for Connecticut in [a] manner designed to reduce [federally mandated congestion charges]," as required by § 16-243m. The fact that the financial arrangement *complied* with § 16-243m does not mean, however, that it was *required* by § 16-243m or that the *legislature* had a preference for any particular type of pricing provision or was concerned with the way that the contract for differences would operate under the specific circumstances involved in the capacity clearing price dispute.

[18] The plaintiff claims that *Wheelabrator Lisbon, Inc.*, is distinguishable from the present case because the agreement in that case expressly provided that payment disputes would be resolved by the department. See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 681. Although it seems clear that the parties to a contract could agree to submit a dispute to the department or the authority for resolution, it seems highly doubtful that the parties could confer jurisdiction on the department or the authority to render a declaratory ruling pursuant to § 4-176 by agreement if the department would otherwise lack such jurisdiction. See id., 685 ("[a] subject matter jurisdictional defect may not be waived . . . [or jurisdiction] conferred by the parties, explicitly or implicitly" [internal quotation marks omitted]). As we have indicated, the basis for our decision in *Wheelabrator Lisbon, Inc.*, was not that the agreement under review expressly provided

that the department would resolve disputes, but that the dispute required the department to construe and apply the statutes that it was charged with implementing. We need not resolve the issue of whether the parties can agree to confer jurisdiction on the authority to issue declaratory rulings pursuant to § 4-176 in the present case, however, because the Kleen Energy master agreement had no such provision.

Similarly, to the extent that the plaintiff suggests that the authority lacked jurisdiction to issue a declaratory ruling to resolve the capacity clearing price dispute pursuant to § 4-176 because the parties to the Kleen Energy master agreement had agreed to submit disputes to arbitration, we find it highly doubtful that, if the authority had jurisdiction to issue a declaratory ruling to resolve a contractual dispute, the parties could deprive the authority of such jurisdiction by agreeing to arbitrate such disputes, although the authority could exercise its jurisdiction only if the parties waived their right to arbitrate. Cf. *Catrini* v. *Erickson*, 113 Conn. App. 195, 197, 966 A.2d 275 (2009) (agreement to arbitrate claim does not deprive trial court of jurisdiction to address claim). We need not resolve this issue, however, because we conclude that, even if the Kleen Energy master agreement had not contained the dispute resolution provision, the authority would lack such jurisdiction.

[19] The authority also relies on *Connecticut Resources Recovery Authority* v. *Connecticut Light & Power Co.*, 34 Conn. App. 246, 641 A.2d 398 (1994), to support its position that it had jurisdiction to issue a declaratory ruling on the capacity clearing price dispute. In that case, the plaintiffs, who owned and operated a waste-to-energy facility, entered into an agreement to sell electricity to the power company. Id., 247. The agreement provided that the department would resolve payment disputes and that technical and engineering disputes would be resolved by binding arbitration. Id., 248 nn.2 and 3. A dispute arose and the parties disagreed as to whether it was a pricing dispute or a technical dispute. Id., 248. The trial court found that it was a pricing dispute that should be resolved by the department. Id. On appeal, the Appellate Court concluded that the trial court's finding was not clearly erroneous, and it affirmed the judgment. Id., 249. The Appellate Court stated in dictum, on which the authority in the present case relies, that "the parties' intent as evidenced by their agreement aligns with the intent of the state legislature that the department regulate and supervise public utilities and establish reasonable rates. . . . Both the parties' agreement and public policy dictate that this dispute be resolved by the department." (Citation omitted.) Id. There was no claim in *Connecticut Resources Recovery Authority*, however, that the department lacked jurisdiction pursuant to § 4-176 to render a declaratory ruling resolving the dispute. Indeed, the opinion does not even refer to § 4-176. Rather, the sole issue was whether the dispute was a pricing dispute or a technical dispute. Moreover, there is no indication in the Appellate Court's opinion as to whether the department had approved the agreement between the parties in a final decision in a contested case. Accordingly, we find the case to be of little persuasive value.

[20] If an express statutory provision confers regulatory authority on the authority to continue to supervise and modify the terms of a contract that it had approved after the contract has been executed, the parties are on notice that they ultimately may not receive the benefit of the original bargain and they can take that risk into account before entering the contract. Accordingly, a subsequent modification of the contract by the authority pursuant to the statute would not deprive a party of a contractual right that it had bargained for. Moreover, if a statute mandates the form or the terms of a particular contract, a contract that is inconsistent with the statute would presumably be void as violating public policy. *Brown* v. *Soh*, 280 Conn. 494, 501, 909 A.2d 43 (2006) ("contracts that violate public policy are unenforceable" [internal quotation marks omitted]). Thus, the parties to the contract are on constructive notice that the agency that was charged with implementing the statute and that approved a contract in a decision would have the power to conform the contract to the statute pursuant to § 16-9.

[21] The trial court relied on *Mass* v. *United States Fidelity & Guaranty Co.*, 222 Conn. 631, 649, 610 A.2d 1185 (1992), to support its conclusion that the authority had jurisdiction to resolve the capacity clearing price dispute. In *Mass*, the plaintiffs had claimed that the Insurance Commissioner lacked authority to adopt a particular regulation because the regulation conflicted with the intent of the governing statute. Id., 648–49. This court concluded that the regulation was authorized because it was consistent with the statutory intent and agencies have "a very broad grant of regulatory authority in filling in the interstices" of the statutory schemes that they are charged

with implementing. (Internal quotation marks omitted.) Id., 649. In the present case, the authority has not adopted any regulations governing the form of the master agreement, which it characterized as a "[nonregulated] contract." Moreover, *Mass* did not involve an agency's authority to *alter* the form of a contract that it has approved *after* the contract has been executed. Accordingly, our decision in *Mass* has no application here.

[22] See footnote 9 of this opinion.

[23] In the authority's decision in the proceeding on remand from the plaintiff's initial appeal, the authority concluded that it was not constrained from modifying the master agreement because it was not a contract "for the sale of energy or capacity in which title or property rights to energy or capacity are transferred to an electric distribution company." Rather, it was a "financial [contract] in which [the plaintiff] is obligated to perform by making itself available to perform as a capacity resource in the ISO New England [Inc.] [f]orward [c]apacity [m]arket." See footnote 7 of this opinion. Accordingly, the authority concluded, the modification of the master agreement did not "fall within [the Federal Energy Regulatory Commission's] exclusive wholesale electric energy ratemaking jurisdiction." See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 531 F.3d 183, 185, 188 (2d Cir. 2008) (Federal Energy Regulatory Commission has exclusive responsibility "for regulating the rates charged by qualifying facilities in power purchase agreements" pursuant to provision of federal public utility regulatory act, 16 U.S.C. § 824a-3 [e]). The authority has provided no authority for the proposition, however, that it has jurisdiction to modify any contract that it has approved that does *not* fall within the exclusive jurisdiction of the Federal Energy Regulatory Commission, even after the contract has been executed, and even in the absence of statutory authority to modify the contract or implicit authority to conform it to statutory requirements.

[24] There was no express claim in *Wheelabrator Lisbon, Inc.*, that the contract under review in that case should be altered to conform to the governing statutes. It was implicit in that case, however, that, if upon review of the contract, the department determined that it was inconsistent with the provisions of the governing statutes, the department would have jurisdiction under § 16-9 to alter its terms to conform to the statute. *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 689 (contract "was subject to review and approval by the department to ensure that it complied with the applicable statutes and regulations and that it was consistent with public policy regardless of whether the parties voluntarily had agreed to its terms"). Although Wheelabrator claimed that "the department's substitution of its dominion over the [certificates] for [Wheelabrator's] control over the property is a taking without compensation" in violation of the state constitution; (internal quotation marks omitted) id., 699; it did not claim that allowing the department to alter the contract to conform to the statute pursuant to § 16-9 would violate constitutional due process principles or the impairment of contracts clause.

[25] We emphasize that we do not condone the plaintiff's conduct in this matter. The conclusion of the authority and the trial court that the plaintiff engaged in forum shopping and that its conduct resulted in the waste of administrative and judicial resources finds support in the record. Such behavior, however, cannot confer jurisdiction on the authority that was otherwise lacking.